**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN OLIVER SNOW,
        *Plaintiff-Appellant,*

v.

E. K. MCDANIEL, in his official
capacity as Warden at ELY STATE
PRISON (ESP); DEBRA BROOKS, in
her official capacity as Associate
Warden for Operations at ESP;
ADAM ENDEL, in his official
capacity as Associate Warden for
Programs at ESP; ROBERT
BANNISTER, M.D. Medical Director
for Nevada Department of
Corrections; STEVEN MACARTHUR;
MAX CARTER,
        *Defendants-Appellees.*

No. 10-16951

D.C. No.
3:08-cv-00046-RCJ-
VPC

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, Chief District Judge, Presiding

Argued and Submitted October 13, 2011
Submission Withdrawn October 24, 2011
Resubmitted May 25, 2012
San Francisco, California

Filed May 25, 2012

Before: Betty B. Fletcher, Stephen Reinhardt, and
A. Wallace Tashima, Circuit Judges.

Opinion by Judge B. Fletcher

5747

---

## COUNSEL

Marc Picker (argued), Angela Lightner, Marc Picker, Esq., Ltd., Reno, Nevada, for the appellant.

Clark G. Leslie, Senior Deputy Attorney General, Carson City, Nevada, for the appellees.

---

## OPINION

B. FLETCHER, Circuit Judge:

John Snow, a 69-year-old death-row inmate, appeals the grant of summary judgment denying his claims for violations of his rights under the Eighth Amendment. Snow claims that the doctors and wardens in the Nevada Department of Corrections were deliberately indifferent to his medical needs; specifically, the diagnosis by more than one orthopedic surgeon that Snow needed surgery to replace both of his hips, which have degenerated so severely that Snow has excruciating pain and can barely walk. Snow's medical records and statements by physicians and specialists in the records, and all reasonable interferences in favor of Snow drawn from the records, suggest that the defendants' actions violated Snow's Eighth

Amendment rights. We have jurisdiction under 28 U.S.C. § 1291. We reverse in part, affirm in part, and remand.

# I

Because this case was resolved at summary judgment, we present the facts in the light most favorable to Snow as the non-moving party. *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1051 n.1 (9th Cir. 2002).

Snow is a prisoner in the custody of the Nevada Department of Corrections ("NDOC"). Before he began experiencing chronic hip pain in 2004, Snow was able to walk and exercise normally. Today, Snow cannot exercise and he needs assistance just to get up off of his bunk. Even with help, Snow can barely walk because of the pain caused by his degenerative hip disease.

Snow first complained to NDOC medical staff about his hip and leg pain in 2005. Steven MacArthur, M.D., a NDOC staff physician, examined Snow in late 2005. He told Snow that he would schedule an appointment for Snow to see an orthopedic surgeon about his hip and leg pain. Dr. MacArthur never put anything into Snow's chart about a referral, however, and never scheduled an appointment. In January 2006, in response to a medical kite (*i.e.*, a written request) submitted by Snow, NDOC medical staff prescribed ibuprofen and ordered hip x-rays. Eric Goldberg, M.D., examined the x-rays in March 2006. The x-rays showed that Snow had three pins in his left hip. Investigation suggested this had been done as a child to stabilize a slipped capital epiphysis. Dr. Goldberg diagnosed Snow as having severe degenerative changes in both of his hips. A staff nurse saw the x-rays and told Snow that the amount of degeneration and arthritis shown by the x-rays was "very impressive." To address the hip pain and degeneration, NDOC medical staff prescribed Neurontin, a neuropathic pain reliever, and Tums.

An orthopedic surgeon finally examined Snow in September 2006. Mark Rhodes, M.D., an independent medical consultant, confirmed that Snow's hips exhibited severe degeneration. Based on his observations, Dr. Rhodes guessed that Snow was in distressing pain due to the condition of his hips. Based on his clinical findings, Dr. Rhodes expected Snow to suffer from excruciating and unbearable pain. He was surprised Snow was able to walk at all. Dr. Rhodes prescribed pain relievers, and stated that in the long term Snow needed a bilateral total hip arthroplasty ("THA") to replace both hip joints. Mark Bishop, M.D., Snow's NDOC treating physician, reviewed Dr. Rhodes's notes and ordered pain relievers for Snow.

Snow saw Dr. Rhodes again in January 2007. Dr. Rhodes wrote in his notes that Snow "can barely walk" due to his degenerated hips and that "[t]here is no option here other than surgery for relief (THA Bilateral)." Dr. Rhodes indicated that Snow's condition was an "emergency," and that although it significantly affected Snow's quality of life, it was not life-threatening. As a short-term measure to offer Snow relief until he was able to get hip surgery, Dr. Rhodes prescribed a non-steroidal anti-inflammatory drug ("NSAID") called Indocin.

Dr. Bishop ordered the Indocin and referred the recommendation for surgery to the NDOC Utilization Review Panel ("URP"). The URP is composed of six NDOC physicians who are board-certified in family medicine or other similar disciplines, and includes the NDOC Medical Director. The URP reviews requests for significant medical procedures by outside providers, such as surgery for an inmate. The URP denied the "emergency" recommendation for Snow to undergo hip surgery because "it was not a life[-]threatening situation." The URP stated only that it was "[o]kay to treat pain" but that there would be "[n]o joint replacements."

Snow continued to have significant hip pain, and sporadically received the pain medication and Indocin that had been

prescribed for him. In March 2007, Warden E.K. McDaniel approved a request from the medical staff to prohibit corrections officers from using ankle restraints on Snow or from ordering Snow to kneel. The request states that Snow "has frozen hips [and] joints" and that he "needs hip replacement."

In July, Dr. Bishop referred Snow to NDOC's Regional Medical Facility, a facility that provides full-time medical care for inmates, because Snow's creatinine levels were very high. Dr. Bishop concluded that Snow's creatinine levels were going up because of the NSAIDs he was taking to manage his severely degenerated hips. Dr. Bishop submitted an "urgent" request to the URP for Snow to receive hip surgery, writing that Snow "[n]eeds hip surgery[;] creatinine rapidly rising on needed pain meds." In contrast to the request for surgery in January, Dr. Bishop changed his mind and stated that Snow's medical problem was "potentially life threatening."

David Mar, M.D., another NDOC physician, examined Snow two weeks later and prescribed Tylenol and an analgesic balm for his pain. Dr. Mar decided that nothing else was needed. The URP reviewed and rejected the recommendation for hip surgery.

Robert Bannister, M.D., the NDOC Medical Director, noted in Snow's medical chart that NSAIDs can be nephrotoxic when combined with other medications taken regularly by Snow. Dr. Bannister ordered an increase in the dosage of Tylenol Snow received each morning and additionally prescribed Tylenol with codeine to take every night. Although Snow could not kneel or exercise outside and had to use a wheelchair to go to the visiting area, Dr. Bannister concluded that Snow was "functioning satisfactorily in his current living situation and in performance of any required activities." Later, because the NDOC could not provide Snow with enough of the analgesic balm prescribed by Dr. Mar, NDOC medical staff supplemented Snow's medication regimen with oxycodone, a powerful narcotic. NDOC medical staff subsequently

prescribed a regular dose of oxycodone to allow Snow to be able to get through the day.

In 2008, Snow filed a complaint alleging several 42 U.S.C. § 1983 claims. In his first amended complaint, Snow alleges that prison officials, acting in their individual and official capacities, violated his rights under the Fourth, Eighth, and Fourteenth Amendments. Count I of the first amended complaint requests declaratory and injunctive relief to remedy a custom or policy of inappropriate treatment of serious medical conditions, such as his hip condition. Count II requests damages for the defendants' deliberate indifference to Snow's medical needs and their deliberate interference with recommended medical treatment. Count III requests damages under the same cause of action as Count I. The rest of Snow's claims were dismissed by the district court after the defendants filed a motion to dismiss.

After Snow filed his lawsuit, the defendants sent Snow to see another orthopedic surgeon. Richard Long, M.D., described Snow's condition from 2004 to 2008:

> He has progressively worsened to where at this time he is able to walk only a few feet unsupported. He has not left his building to go outside in the yard to exercise for two years. He can get down a flight of stairs, hanging on to the banister. He can walk probably 50 feet, to a shower and back unsupported, but with difficulty. He is able to sleep only on his side. He has extreme difficulty getting any socks on and his pants on.

Dr. Long recommended a bilateral THA for Snow. The URP again rejected surgery.

More than a year later, in September 2009, the URP finally approved Snow for bilateral THA surgery.

In 2010, the defendants filed a motion for summary judgment. The magistrate judge submitted a report and recommendation to the district court, in which he concluded that there was a material issue of fact as to whether the defendants' treatment of Snow was medically acceptable. The magistrate judge also recommended that five of the six defendants named in the lawsuit were not entitled to summary judgment because there were material issues of fact as to whether they had been deliberately indifferent to Snow's serious hip condition. Next, the magistrate judge concluded that Snow's claim for injunctive relief was moot based on the 2009 URP approval of bilateral THA surgery for Snow and a scheduled date for the surgery that had already passed.

Snow filed objections to the magistrate judge's report and recommendation. Snow objected that he did not have hip surgery in 2009 and that hip surgery had never been scheduled by the NDOC.

The district court rejected the report and recommendation, and granted the defendants' motion for summary judgment. The district court concluded that there was merely a disagreement of opinion about the treatment of Snow with pain medications until surgery was approved in 2009. The district court stated that "[p]laintiff has provided no evidence to support that the use of pain medications, as prescribed by the treating medical officials, was medically unacceptable under the circumstances as required by the Ninth Circuit." The district court did not discuss the magistrate judge's recommendations on Snow's policy and practice claims and did not reach the issue of personal liability for each defendant.

## II

### A

Snow contends that the district court erred by granting summary judgment on Count II—his claim that the defen-

dants were deliberately indifferent to his serious medical needs and that they deliberately interfered with the recommendation that he undergo a bilateral THA. We review a grant of summary judgment de novo and must determine, viewing the facts in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

**[1]** The Eighth Amendment prohibits the imposition of cruel and unusual punishment and "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quotation marks removed). A prison official violates the Eighth Amendment when he acts with "deliberate indifference" to the serious medical needs of an inmate. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). To establish an Eighth Amendment violation, a plaintiff must satisfy both an objective standard— that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference.

**[2]** To meet the objective standard, the denial of a plaintiff's serious medical need must result in the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104. The State concedes that Snow's hip condition presents a serious medical need and meets the objective standard.

The subjective standard of deliberate indifference requires "more than ordinary lack of due care for the prisoner's interests or safety." *Farmer*, 511 U.S. at 835 (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). The state of mind for deliberate indifference is subjective recklessness. *See id.* at 835-41. But the standard is "less stringent in cases involving a prisoner's medical needs . . . because 'the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.' "

*McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) (partially overruled on other grounds) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)) (alterations omitted). Similarly, "[i]n deciding whether there has been deliberate indifference to an inmate's serious medical needs, we need not defer to the judgment of prison doctors or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

**[3]** The record shows that the defendants provided medical care, medications, and specialist referrals to Snow during the period in question. Even so, "[a] prisoner need not prove that he was completely denied medical care" in order to prevail. *Lopez*, 203 F.3d at 1132. Here, Snow may prove deliberate indifference by showing that prison administrators or physicians denied, delayed, or intentionally interfered with surgery for his hip condition, or that the way prison staff delivered medical care indicated deliberate indifference. *See id.* (citing *Estelle*, 429 U.S. at 105).

We are specifically concerned with the URP's repeated denials of bilateral THA surgery, which had been recommended by specialists and by Snow's treating physician. According to the URP policies, when deciding whether to approve a significant medical procedure, such as surgery for an inmate, the URP considers factors such as the length of the inmate's remaining sentence, how well the inmate is able to perform activities of daily living, the available resources, and the risks and benefits of the proposal. The URP policy officially classifies joint replacement surgery as "not always necessary." Stated differently, the URP policy supports approving joint replacement surgery when the inmate's condition significantly interferes with his or her ability to function in prison.

But instead of approving the needed hip surgery when Snow's treating physician and a specialist considered the request an "emergency" and when the hip condition began to significantly interfere with Snow's ability to function—the

medical staff and warden had to prohibit corrections officers from using ankle restraints on Snow or ordering him to kneel, among other limitations—the URP repeatedly refused to authorize the procedure. The URP gave no medical reason for the denials. Instead, the URP either gave no reason at all, or flatly told Snow that they would not approve any requests for joint replacement surgery.

The case of *Hamilton v. Endell*, 981 F.2d 1062 (9th Cir. 1992) (overruled in part on other grounds), is instructive. In *Hamilton*, the prison officials referred the plaintiff to a surgeon to treat a chronic ear problem. At the same time, the prison officials tried to arrange a flight to transport the plaintiff from the state prison in Alaska to a federal facility in Oklahoma. The surgeon, who operated on the plaintiff's ear several times, instructed that the plaintiff's "ear had not yet healed and the [the plaintiff] should . . . not fly anywhere for about six months." *Id.* at 1064. Despite these instructions, the defendants solicited a second medical opinion from another physician. The second physician stated, based on his own personal experience and based upon consultation with another specialist—but not based on examination of the plaintiff or discussion with the surgeon—that the plaintiff could fly immediately. The plaintiff alleged that he suffered severe damage to his ear as a result of the flight. Analogizing to cases that found deliberate indifference where prison officials and doctors deliberately ignored a prior physician's instructions for reasons unrelated to the medical needs of the prisoner, the court held that "choosing to rely upon a medical opinion which a reasonable person would likely determine to be inferior" and forcing the plaintiff to fly "may have amounted to the denial of medical treatment" and could have constituted deliberate indifference. *Id.* at 1067.

[4] As in *Hamilton*, the circumstances here raise an inference that the defendants were unreasonably relying on their own non-specialized conclusions with deliberate indifference to Snow's medical needs. Both orthopedic surgeons hired by

NDOC to consult on this case recommended a bilateral THA, and did not recommend indefinite maintenance on NSAIDs, steroids, and narcotics as a solution. The NDOC physician who treated Snow and who submitted the two 2007 requests for surgery to the URP described the requests as an "emergency" and as "urgent." Conversely, the NDOC physicians on the URP are not board-certified in orthopedic surgery or in related disciplines, and with isolated exceptions none of them ever directly examined or treated Snow. Only the July 2007 denial by the URP purported to rely on a contrary medical opinion by a non-specialist physician who examined Snow.

**[5]** Further, evidence in the record suggests that the URP ignored the recommendations of specialists and treating physicians for reasons unrelated to Snow's medical needs. During his deposition, Theodore D'Amico, M.D., who was the previous NDOC medical director, testified that he did not recall any hip replacement surgeries at all during his tenure. And a former NDOC nurse testified that around this time there was an official policy against treating chronic pain, and Warden McDaniel told the medical staff that "[i]f one of these [death row] inmates gets deathly ill, don't knock yourself out to save their life. There's plenty more to take their place." This deposition testimony supports the inference that the defendants had improper motives when applying the URP policy to deny joint replacement surgery and medical services to death row inmates. A reasonable jury could conclude that the defendants refused to authorize surgery in order to avoid eventually paying for it, relying on the possibility that Snow could die of natural causes or be executed by the State in the near future. Evidence of an improper motive can support a conclusion that a defendant acted with deliberate indifference. *George v. Sonoma Cnty. Sheriff's Dep't*, 732 F. Supp. 2d 922, 937 (N.D. Cal. 2010) (citing *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)); *see also Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986) (holding that budgetary constraints do not justify cruel and unusual punishment).

**[6]** We conclude that a reasonable jury could find that the defendants acted with deliberate indifference to Snow's medical needs when they refused to authorize the recommended joint-replacement surgery. The record also shows that Snow presented sufficient evidence to support a finding that he was substantially harmed by the defendants' refusal to treat his hip condition as recommended. *See McGuckin*, 974 F.2d at 1060 (requiring plaintiffs to show that delay led to further injury in cases of deliberate indifference based on the delay of medical care).

**B**

The defendants argue and the district court ruled at summary judgment that the decision by NDOC physicians to treat Snow pharmacologically rather than surgically was medically acceptable, and that Snow cannot base his claimed Eighth Amendment violation on a mere difference of opinion over the course of treatment. Even if it is possible to characterize the treatment decisions of the URP this way, we disagree with the conclusion that the defendants are entitled to summary judgment on these grounds.

A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir 1989). Even proof that a physician has committed medical malpractice does not necessarily violate the Eighth Amendment. *See Estelle*, 429 U.S. at 106. To show deliberate indifference, the plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and that the defendants "chose this course in conscious disregard of an excessive risk to plaintiff's health." *Jackson*, 90 F.3d at 332 (internal citations removed).

There is clearly a difference of medical opinion here. On the one hand, physicians often attempt non-surgical interven-

tions to address hip pain.[1] The NDOC physicians on the URP, who are all board-certified in family medicine or other similar disciplines, decided to treat Snow's hip pain and immobility with medication instead of surgery. This persisted for several years. The NDOC physicians adjusted the medications to increasingly rely on narcotics when Snow's creatinine levels rose to dangerous levels. On the other hand, from 2007 through 2009 two orthopedic specialists and Snow's NDOC treating physician recommended bilateral THA surgery.

**[7]** The defendants argue that this was merely a difference of opinion that cannot amount to deliberate indifference. We disagree. Based on the unchallenged medical records and inferences drawn in favor of Snow, a reasonable jury could conclude that the decision of the non-treating, non-specialist physicians to repeatedly deny the recommendations for surgery was medically unacceptable under all of the circumstances.

**[8]** After Snow developed severe hip pain, the defendants eventually sent him for evaluation by orthopedic surgeons. Both specialists hired by the NDOC recommended bilateral THA surgery. One of the specialists, Dr. Rhodes, testified at his deposition that Snow's likelihood of success after a THA was very high, and that surgery would help improve Snow's health and mobility. And Dr. Rhodes testified that after surgery Snow's hip pain would probably disappear, and that Snow would no longer require any painkillers for his hips. Conversely, neither specialist recommended indefinite maintenance on NSAIDs, steroids, or narcotics. The record also shows that medications may have harmed Snow's kidneys, and that the narcotics did not alleviate Snow's significant mobility issues. In fact, Dr. Rhodes stated in January 2007

---

[1]*See* Questions and Answers about Hip Replacement, National Institute of Arthritis and Musculoskeletal and Skin Diseases, *available at* http://www.niams.nih.gov/Health_Info/Hip_Replacement/default.asp (last visited May 17, 2012).

that there "is no option here other than surgery for relief." Because, on this record, it is a controverted issue of fact, it should be for the jury to decide whether any option other than surgery was medically acceptable.

The defendants ignored outside expert advice, relying solely on their own medical judgment for three years before eventually approving surgery. They claim that the specialists did not explicitly recommend "immediate" surgery. While a medication-only course of treatment may have been medically acceptable for a certain period of time, the question remains whether it was medically unacceptable and subjectively reckless to ignore a "long term" recommendation for three years, or to ignore "emergency" and "urgent" requests for more than two years. These are jury questions.

The cases relied upon by the defendants are distinguishable. The plaintiff in *Toguchi v. Chung*, 391 F.3d 1051 (9th Cir. 2004), argued that the defendant physician should not have discontinued the use of a "superior" type of antipsychotic medication. Plaintiff's expert did not address that specific claim, and the defendant submitted expert testimony that her actions met the standard of care. *Id.* at 1055-56. Here, conversely, specific statements by physicians in the record raise triable issues of fact whether refusing to authorize surgery was medically unacceptable. And unlike in *Sanchez v. Vild*, where only one prison doctor told the inmate that surgery would be necessary, here the consistent recommendation by two outside specialists over the course of three years was that Snow needed hip surgery to alleviate his severe pain and mobility issues. *See Sanchez*, 891 F.2d at 242.

## III

In his lawsuit, Snow named the following defendants, acting in their individual and official capacities: (a) E.K. McDaniel, ESP Warden; (b) Adam Endel, ESP Associate Warden of Programs; (c) Robert Bannister, M.D., NDOC

Medical Director; (d) Steven MacArthur, M.D., an ESP staff physician; (e) Max Carter, a physician's assistant employed by NDOC; and (f) Debra Brooks, ESP Associate Warden of Operations. Snow argues that summary judgment should have been denied as to all of the defendants except Brooks, whom he concedes is entitled to summary judgment.

## A. Warden McDaniel and Associate Warden Endel

Snow argues that the prison administrators are liable for the medical staff's Eighth Amendment violations because the administrators were aware of Snow's hip condition and of the medical staff's inadequate treatment and yet failed to act or order changes to customs and policies. The defendants argue that there is no evidence in the record that Warden McDaniel or other administrators were personally involved in any of the medical treatment decisions.

[9] "Under Section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability." *Hansen v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989). A supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Id.* at 646. A supervisor may be liable if the supervisor knew of the violations and failed to act to prevent them. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

[10] During her deposition, a former NDOC nurse testified that the warden and his assistants were aware of all grievances regarding inappropriate medical treatment. The record shows that Snow submitted several grievances about the denial of the recommended hip surgery. Also, Warden McDaniel and Associate Warden Endel personally reviewed the "no-kneel" order—which explicitly states that Snow "needs hip replacement"—and other accommodations made on behalf of Snow for his hip condition. Through these orders and griev-

ances, Snow has sufficiently demonstrated that Warden McDaniel and Associate Warden Endel were aware of his serious hip condition. Because they were aware Snow needed surgery and failed to act to prevent further harm, Warden McDaniel and Associate Warden Endel are not entitled to summary judgment.

Further, the former nurse also testified that Warden McDaniel told medical staff: "If one of these [death row] inmates gets deathly ill, don't knock yourself out to save their life. There's plenty more to take their place." Thus, there is also a material issue of fact as to whether Warden McDaniel failed to act to prevent the medically unacceptable care in Snow's case because of animus towards death row inmates.

### B. NDOC Medical Director Robert Bannister, M.D.

**[11]** Dr. Bannister was the head of the URP during the relevant period. Consequently, he was directly involved with the decision to deny surgery recommended by specialists and treating physicians in favor of a plan to treat Snow with medication alone. Because there is a material issue of fact as to whether those decisions were deliberately indifferent to Snow's medical needs, Dr. Bannister is not entitled to summary judgment.

### C. Staff Physician Steven MacArthur, M.D.

**[12]** Snow argues that Dr. MacArthur is not entitled to summary judgment because he refused to make an appointment in January 2006 for Snow to see an orthopedic surgeon about his chronic severe hip pain. Snow also points to evidence in the record that suggests that Dr. McArthur disliked him and purposefully refused to treat him. In order to prove deliberate indifference through delay of medical care, then, Snow must show that Dr. McArthur's failure to schedule an appointment for him led to further injury. *See McGuckin*, 974 F.2d at 1060. And "[a] finding that the defendant's neglect of

a prisoner's condition was an 'isolated occurrence' or an 'isolated exception' to the defendant's overall treatment of the prisoner ordinarily militates against a finding of deliberate indifference." *Id.* (internal citations removed). Although it is unlikely that Dr. McArthur's failure to schedule a consultation for Snow had a substantial effect on the timing of Snow's treatment, any delay in treatment that was potentially motivated by animus creates a material issue of fact for the jury. We reverse the grant of summary judgment to Dr. MacArthur.

## D.  Physician's Assistant Max Carter

Snow alleged that he received his pain medications inconsistently and in doses that were not sufficient. In July 2007, Snow sent a medical kite that asked: "If I can only have and take Indocin for 10 days a month, are you prescribing something in its place to ease my pain the other 20 days?" In response, Carter wrote: "[N]ope — gonna let you suffer until you tell me its [sic] working or not — not much need in taking something that doesn't work." Dr. Bishop reviewed Carter's response a week later and overruled it. Dr. Bishop wrote: "Mr. Snow, I reviewed this kite response and totally disagree. Pain meds are appropriate and I am ordering them today for your needed well being." Carter testified at deposition that his "gonna let you suffer" comment to Snow was a "tongue-and-cheek" attempt at humor.

**[13]** Carter's "gonna let you suffer" statement is a textbook example of the state of mind required to violate the Eighth Amendment. Whether or not he made the statement in an attempt at humor is an issue for the jury. We reverse the grant of summary judgment to Carter.

## IV

In entering judgment dismissing Snow's lawsuit, the district court granted summary judgment on Counts I and III, Snow's two "custom and policy" claims against the State of

Nevada and the NDOC. The magistrate judge recommended granting summary judgment on Count III, Snow's claim for damages. The magistrate judge concluded that Count I, Snow's claim for injunctive relief, was moot because the date defendants had scheduled for Snow's hip surgery had passed.

**[14]** The district court properly granted summary judgment on Count III. That claim seeks damages from the State and the NDOC for the custom or policy of refusing to provide certain types of medical care to inmates. *See Kentucky v. Graham*, 473 U.S. 159, 165-67 (1985) (discussing official capacity suits as a way to sue the governmental entity by alleging a custom or policy claim). Because federal courts are barred by the Eleventh Amendment from awarding damages against state officials acting in their official capacities, this claim is dismissed. *See Bank of Lake Tahoe v. Bank of Am.*, 318 F.3d 914, 918 (9th Cir. 2003).

The district court improperly granted summary judgment on Count I, Snow's claim for injunctive relief. After the magistrate judge dismissed the claim as moot, Snow objected that he had not yet received hip surgery and that it was no longer scheduled or approved. Snow's objection preserved this claim for review by the district court, and created a factual dispute as to whether the claim was moot.

Snow argues that he is entitled to injunctive relief based on the defendants' policy or custom of deliberate indifference to the medical needs of inmates. Specifically, Snow alleges that NDOC medical staff and prison administrators have a policy or custom of acting without adequate medical justification and in deliberate indifference to the serious medical needs of inmates when they refuse to treat non-life-threatening medical conditions, such as the need for joint replacement surgery. In order to survive summary judgment on this claim, Snow must

> come forward with evidence from which it can be
> inferred that the defendant-officials were at the time

suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so.

*Farmer*, 511 U.S. at 846.

**[15]** On the record at summary judgment, the court could infer that the defendants were acting with deliberate indifference and were likely to continue to refuse to authorize hip surgery for Snow. *See Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1191 (9th Cir. 2002) (holding that summary judgment is not appropriate if a jury could infer that policymakers knew that their policies would pose a risk of substantial injury). We conclude that summary judgment on this claim was premature. Snow's claim for an injunction to start the pre-operative process for hip surgery may proceed. When considering this claim on remand, however, the district court may consider supplemental medical records and filings by both parties. *Farmer*, 511 U.S. at 846 ("[T]he inmate may rely, in the district court's discretion, on developments that postdate the pleadings and pretrial motions, as the defendants may rely on such developments to establish that the inmate is not entitled to an injunction.").

**V**

During this appeal, the defendants filed a motion to request permission to supplement the record with medical records generated, for the most part, after the defendants filed the motion for summary judgment. At oral argument, plaintiff's counsel stated that Snow had not had hip surgery because of a cardiac issue. Counsel stated that the cardiac issue prevented Snow from undergoing surgery until at least November 2011, and potentially beyond that date.

On appeal of summary judgment, courts generally consider only the record that was before the district court. *United*

*States v. W.R. Grace*, 504 F.3d 745, 766 (9th Cir. 2007); *see Lippi v. City Bank*, 955 F.2d 599, 604 (9th Cir. 1992) ("Our review is limited to the record presented to the district court at the time of summary judgment."). This rule has three exceptions: "(1) to correct inadvertent omissions from the record, (2) to take judicial notice, and (3) to exercise inherent authority . . . in extraordinary cases. Considerations of institutional expertise and notice support our limitation of these exceptions to unusual circumstances." *W.R. Grace*, 504 F.3d at 766 (citations and internal quotation marks removed).

The State concedes that the motion to supplement the record does not fall within one of the three recognized exceptions. Instead, the State claims that the supplemental medical records show good cause for delaying Snow's hip replacement surgery. The State also claims that Snow's need for injunctive relief is moot because pre-operative procedures had previously been initiated for a hip replacement in 2009.

**[16]** We deny the State's motion to supplement the summary judgment record. The supplemental medical records do not "establish beyond any doubt the proper resolution" of the order granting summary judgment. *Colbert v. Potter*, 471 F.3d 158, 165-66 (D.C. Cir. 2006) (quoting *CSX Transp., Inc. v. Garden City*, 235 F.3d 1325, 1330 (11th Cir. 2000)). Although Snow's cardiac issue could eventually affect his claim for injunctive relief, the supplemental medical records demonstrate only that Snow may not have been a candidate for surgery until November 2011 because of a cardiac condition from some undetermined time. And the supplemental medical records do not, on their own, demonstrate that Snow could not have obtained surgery at an earlier date. In fact, if the defendants are not able to prove that Snow was ineligible for surgery in 2007 and 2008, Snow may be able to show that the decision not to authorize surgery before the onset of the cardiac problem has left him crippled for life. New evidence should be presented to the district court on remand.

## VI

The district court improperly concluded that there is a mere disagreement of medical opinion in this case. By treating the record here as a mere disagreement of opinion, the district court did not identify the triable issues of fact whether the defendants denied, delayed, or intentionally interfered with appropriate medical treatment, or whether the defendants' course of treatment was medically unacceptable. And because Snow has not yet had hip surgery, and may or may not be eligible for surgery, his claim for injunctive relief is not moot and should be addressed on remand.

For these reasons, we reverse: (1) the denial at summary judgment of Snow's claim for injunctive relief against the defendants in their official capacities; and (2) the denial at summary judgment of Snow's claim for damages against the defendants in their individual capacities, other than Brooks. We affirm the grant of summary judgment to Brooks and the denial at summary judgment of Snow's claim for damages against the defendants in their official capacities. We deny the defendants' motion to supplement the record on appeal, and remand for further proceedings.

**REVERSED** in part, **AFFIRMED** in part, and **REMANDED** for further proceedings consistent with this opinion. Snow is awarded costs on appeal.