**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JOHN COLWELL,
*Plaintiff-Appellant*,

v.

ROBERT BANNISTER and HOWARD
SKOLNIK,
*Defendants-Appellees*.

No. 12-15844

D.C. No.
3:10-cv-00669-
LRH-WGC

OPINION

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted
April 7, 2014—San Francisco, California

Filed August 14, 2014

Before: Barry G. Silverman, William A. Fletcher,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Silverman;
Dissent by Judge Bybee

**SUMMARY**[*]

**Prisoner Civil Rights**

The panel reversed the district court's summary judgment and remanded for trial in an action brought pursuant to 42 U.S.C. § 1983 by a Nevada state prisoner who was denied cataract surgery because of a Nevada Department of Corrections policy under which cataract surgery is refused if an inmate can manage to function in prison with one eye.

The panel held that blindness in one eye caused by a cataract is a serious medical condition. The panel further held that the blanket, categorical denial of medically indicated surgery solely on the basis of an administrative policy that "one eye is good enough for prison inmates" is the paradigm of deliberate indifference.

Dissenting, Judge Bybee stated that he would hold that the respondents were not deliberately indifferent to plaintiff's alleged serious medical needs because plaintiff did not meet the difficult legal burden of showing a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Mason Boling (argued) and Lauren Murphy (argued), Certified Law Student Representatives, and Dustin E. Buehler, Supervising Attorney, University of Arkansas Federal Appellate Litigation Project, Fayetteville, Arkansas; Michelle King and Joy Nissen, Certified Law Student Representatives, and Gregory C. Sisk, Supervising Attorney, University of St. Thomas School of Law Appellate Clinic, Minneapolis, Minnesota, for Plaintiff-Appellant.

Catherine Cortez Masto, Attorney General, and Clark G. Leslie (argued), Senior Deputy Attorney General, Office of the Nevada Attorney General, Carson City, Nevada, for Defendants-Appellees.

**OPINION**

SILVERMAN, Circuit Judge:

Plaintiff John Colwell, an inmate in the Nevada Department of Corrections, is blind in one eye due to a cataract. It is undisputed that his treating doctors recommended cataract surgery and that the surgery would restore his vision. However, the surgery was denied by NDOC supervisory medical personnel because of the NDOC's "one eye policy" – cataract surgery is refused if an inmate can manage to function in prison with one eye.

We hold today, as numerous other courts considering the question have, that blindness in one eye caused by a cataract is a serious medical condition. We also hold that the blanket, categorical denial of medically indicated surgery solely on

the basis of an administrative policy that "one eye is good enough for prison inmates" is the paradigm of deliberate indifference. We reverse the grant of summary judgment in favor of the prison officials and remand for trial.

## BACKGROUND

Because this case was resolved at summary judgment, we present the facts in the light most favorable to Colwell, the non-moving party. *See Snow v. McDaniel*, 681 F.3d 978, 982 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).

Colwell is a 67-year-old man serving multiple criminal sentences, including life without the possibility of parole. He did not have eye problems when he was incarcerated in 1991, but he subsequently developed cataracts in both eyes and underwent cataract-removal surgery on his left eye in 2001. By October 2001, a cataract had developed in Colwell's right eye that rendered him totally blind in that eye by 2002. That cataract has never been treated and is the medical condition at issue in this case.

According to R. Bruce Bannister, D.O., the NDOC Medical Director, a cataract is "cloudiness (opacity) of the lens of the eye" which "does no damage to the eye and can be removed at any time." Dr. Bannister, who is not an optometrist or ophthalmologist, declared that a cataract does not cause pain, require urgent attention, or lead to permanent vision loss. He declared further that a delay in removing a cataract causes no harm. The NDOC has a formal written policy for cataract treatment, Medical Directive 106, which states in part:

**PURPOSE:**

...

It is the policy of the Department that inmates with cataracts will be evaluated on a case by case basis, taking into consideration their ability to function within their current living environment.

...

**PROCEDURES:**

106.01 Surgical Removal of Cataracts

1. Patients with visual impairment incompatible with the ability to perform the required tasks of daily living in their current living environment may be considered for removal of a cataract.

2. All cataracts extraction requests must be approved by the Utilization Review Panel and the Medical Director.

At least three medical providers – Drs. Snider, Fischer (ophthalmologist), and Fisher (optometrist) – recommended that Colwell's right-eye cataract be treated. Colwell first informed the NDOC of blindness in his right eye during an October 2001 physical with prison physician Dr. Snider. In July 2002, Dr. Snider noted the presence of the cataract and that Colwell "need[ed] two functioning eyes" because he

worked sewing mattresses.[1]  Dr. Snider referred Colwell to Michael J. Fischer, M.D., an outside ophthalmologist.  Dr. Fischer examined Colwell in September 2002, observed that Colwell's "visual acuity was correctable to 20/20 in the left eye," found "a mature cataract in the right eye," and concluded that right-eye cataract surgery was indicated. Based on Dr. Fischer's recommendation, Dr. Snider submitted three requests for surgery to the Utilization Review Panel.[2]   The Panel denied Dr. Snider's requests, first indicating that Colwell was on a waiting list but then denying the two subsequent requests without explanation.  Colwell filed several written grievances between October and December 2003, complaining that although Dr. Fischer had recommended surgery, Dr. Snider told him that the "department policy is 'one eye only' is needed" and the surgery would not be approved.  All of Colwell's grievances were denied.

Colwell refused his annual physical every year from 2004 to 2008 and did not receive further vision care until September 2009, when he requested a cataract consultation. A prison optometrist, a different Dr. Fisher, examined Colwell and noted that he was "having trouble working" and that his right eye was "eligible for cataract surgery."

---

[1] Colwell's medical records filed under seal remain under seal except as to facts discussed herein.

[2] The record in this case does not explain the role or composition of the Utilization Review Panel, but we have previously explained that "[t]he URP is composed of six NDOC physicians who are board-certified in family medicine or other similar disciplines, and includes the NDOC Medical Director. The URP reviews requests for significant medical procedures by outside providers, such as surgery for an inmate." *Snow*, 681 F.3d at 983.

Following up on Dr. Fisher's findings, Dr. John Scott, an NDOC senior physician, requested an ophthalmology consultation. The consultation report indicates that Colwell's condition was not life-threatening but did "significantly affect" his quality of life.

The next week, however, Dr. Scott discontinued the request. His handwritten notes state:

> I had originally submitted request for consult on 10-6-09 based purely on optometrists [sic] opinion. But pt has 20/20 vision OS [left eye]. So can actually qualify to drive a car in many states of . . . U.S. As well this issue has no implications of damage to [right] eye if cataract goes unrepaired. Therefor[e] on further reflection I am [discontinuing] the original request for ophthalogic consultation.

There is no indication Colwell was informed of the discontinuation, and he filed at least one written request inquiring about the status of the referral. He also spoke with Dr. Gedney, another prison physician, about the issue during an appointment on February 18, 2010. Dr. Gedney's notes reflect that Colwell did not meet the criteria for surgery because he has sight out of his left eye, and she told Colwell that he did not qualify for cataract removal due to a "one eye only" policy.

Colwell again filed a series of grievances. He complained that the optometrist who had examined him recommended a cataract consult for possible surgery, but that Dr. Scott had discontinued the consult because he has one "good" eye. His informal grievance was denied with the following response:

> Administrative Regulation 618 defines your request for cataract surgery as cosmetic/elective surgery. One is corrected to 20/20 vision now. *This places this, the 2nd cataract surgery[,] in a non-essential category, despite recommendation from Dr[.]Fisher [the prison optometrist]*. I cannot predict when this may be considered for repair, but at this time, it is not considered for repair by Utilization Review.

(Emphasis added.) Colwell's first-level grievance was denied for the same reason. Dr. Bannister personally denied his second-level grievance on March 9, 2010, stating:

> I have reviewed your written grievance and the answers provided at the informal and first level. I agree with these responses. In almost cases [sic] cataract surgery is not an emergency. You should be evaluated periodically to determine the degree of impairment caused by your cataract with regard to your ability to perform the activities required in your current living situation. Based on the practitioner[']s evaluation the request can be re-considered.

Colwell filed this lawsuit under 42 U.S.C. § 1983 alleging a violation of his Eighth Amendment rights. Specifically, he claims that the prison officials were deliberately indifferent to his serious medical needs in refusing him surgery to restore his vision. On the defendants' motion for summary judgment, the district court ruled, first, that Colwell's cataract-induced blindness was a serious medical need.

However, it also held that Colwell failed to establish that the defendants were deliberately indifferent to that need. It reasoned that Colwell had not shown that the Utilization Review Panel's denial or delay in approving surgery led to further injury to his eye, and explained that "medical providers have determined that surgery is not medically warranted in light of Plaintiff's overall visual acuity and ability to adequately function." The court also held that the Panel's decision to refuse surgery amounted to a difference of opinion over the best course of treatment, and that Colwell had not shown that the NDOC's course of action was "medically unacceptable" or "made in conscious disregard of an *excessive risk* to his health."

## DISCUSSION

### 1.  Legal Standards

We have jurisdiction pursuant to 28 U.S.C. § 1291, and review de novo the district court's grant of summary judgment. *Toguchi v. Chung*, 391 F.3d 1051, 1056 (9th Cir. 2004). "We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Prison Legal News v. Lehman*, 397 F.3d 692, 698 (9th Cir. 2005).

The government has an "obligation to provide medical care for those whom it is punishing by incarceration," and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under § 1983. *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976). In order to prevail on an Eighth Amendment claim for inadequate medical care, a

plaintiff must show "deliberate indifference" to his "serious medical needs." *Id.* at 104. This includes "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow*, 681 F.3d at 985.

To meet the objective element of the standard, a plaintiff must demonstrate the existence of a serious medical need. *Estelle*, 429 U.S. at 104. Such a need exists if failure to treat the injury or condition "could result in further significant injury" or cause "the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)) (internal quotation marks omitted). Indications that a plaintiff has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059–60.

A prison official is deliberately indifferent under the subjective element of the test only if the official "knows of and disregards an excessive risk to inmate health and safety." *Toguchi*, 391 F.3d at 1057 (quoting *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002)) (internal quotation mark omitted). This "requires more than ordinary lack of due care." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)) (internal quotation mark omitted). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also

draw the inference." *Id.* at 837.  Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).  "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, we need not defer to the judgment of prison doctors or administrators."  *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

## 2.   Serious Medical Need

We agree with the district court that monocular blindness is a serious medical need.  Although blindness in one eye is not life-threatening, it is no trifling matter either.  It is not a bump or scrape or tummy ache.  Monocular blindness is the loss of the function of an organ.  Other courts have held that similar and even less severe losses of vision are serious medical needs.  For example, in *Koehl v. Dalsheim*, the Second Circuit held that an inmate who needed eyeglasses for double vision and loss of depth perception had a serious medical need.  85 F.3d 86, 88 (2d Cir. 1996).  Although the inmate's condition did not "inevitably entail pain," he alleged he suffered injuries caused by falling or walking into objects. *Id.*  The court ruled these consequences "adequately meet the test of 'suffering'" the Supreme Court "recognized is inconsistent with 'contemporary standards of decency.'" *Id.* (quoting *Estelle*, 429 U.S. at 103).[3]

---

[3] Several courts have reached conclusions consistent with *Koehl*.  *See Cobbs v. Pramstallar*, 475 F. App'x 575, 580 (6th Cir. 2012) (unpublished) (cataract causing an inmate to struggle with depth perception and walk into objects was a serious medical need where delay

Nevada district courts addressing claims similar to Colwell's have found cataracts to be serious medical needs. The district court in *White v. Snider* concluded that a cataract causing complete blindness in one eye was a serious medical need where doctors recommended cataract removal and the plaintiff experienced headaches and had difficulty seeing in the prison yard. No. 3:08-CV-252-RCJ(VPC), 2010 WL 331742, at *5 (D. Nev. Jan. 26, 2010). The court in *Michaud v. Bannister* likewise held that a plaintiff's "advanced cataract" was "squarely within the ambit of 'serious medical needs'" where the plaintiff testified that "he had lost almost all of his ability to see in his right eye," and "blindness and irreparable injury could result from his untreated cataract." No. 2:08-cv-01371-MMD-PAL, 2012 WL 6720602, at *5 (D. Nev. Dec. 26, 2012). Most recently, the court in *Layton v. Bannister* held that a right-eye cataract was a serious medical need despite the plaintiff's high visual acuity in his left eye, because his affected eye was blind and the condition was significant enough that an examining optometry consultant referred him to the Utilization Review Panel for surgery. No. 3:10-CV-00443-LRH-WGC, 2012 WL 6969758, at *6 (D.

---

in cataract-removal surgery necessitated a riskier procedure and resulted in complications); *compare Garcia v. Nev. Bd. of Prison Comm'rs*, No. 3:06-CV-0118 JCM (VPC), 2008 WL 818981, at *17 (D. Nev. Mar. 24, 2008) ("[T]here is no question that losing sight in one eye constitutes a 'serious' medical need."), *with Canell v. Multnomah Cnty.*, 141 F. Supp. 2d 1046, 1057 (D. Or. 2001) ("While severe eye injuries or legal blindness may constitute a serious medical need, that is not the case with reading glasses."). In a different context, the Supreme Court has indicated that monocular vision is likely to be a disability within the meaning of the Americans with Disabilities Act. *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566–67 (1999) (explaining that "monocularity inevitably leads to some loss of horizontal field of vision and depth perception" and that "people with monocular vision 'ordinarily' will meet the Act's definition of disability").

Nev. Sept. 28, 2012), *report and recommendation adopted*, No. 3:10-CV-00443-LRH-WGC, 2013 WL 420427 (D. Nev. Jan. 31, 2013).

Like the medical conditions in *White*, *Michaud*, and *Layton*, Colwell's cataract is severe. "[I]t is clear that this is not a situation of a minor cataract with little impact on an inmate's vision." *Michaud*, 2012 WL 6720602, at \*5. Colwell's right eye has been blind for more than a decade, and his condition affects his perception and renders him unable to see if he turns to the left. Several doctors, including an ophthalmologist and an optometrist, have found the cataract and resulting vision loss "important and worthy of comment or treatment." *McGuckin*, 974 F.2d at 1059.

Furthermore, the evidence showed that Colwell was not "merely blind" in one eye, but that his monocular blindness caused him physical injury: He ran his hand through a sewing machine on two occasions while working in the prison mattress factory; he ran into a concrete block, splitting open his forehead; he regularly hits his head on the upper bunk of his cell; and he bumps into other inmates who are not good-natured about such encounters, triggering fights on two occasions.

To reiterate, we agree with the district court that Colwell's total blindness in one eye is a serious medical need.

## 3. Deliberate Indifference

We now turn to the second prong of the inquiry, whether the defendants were deliberately indifferent. This is not a case in which there is a difference of medical opinion about which treatment is best for a particular patient. Nor is this a

case of ordinary medical mistake or negligence. Rather, the evidence is undisputed that Colwell was denied treatment for his monocular blindness solely because of an administrative policy, even in the face of medical recommendations to the contrary. A reasonable jury could find that Colwell was denied surgery, not because it wasn't medically indicated, not because his condition was misdiagnosed, not because the surgery wouldn't have helped him, but because the *policy* of the NDOC is to require an inmate to endure reversible blindness in one eye if he can still see out of the other. This is the very definition of deliberate indifference.

The district court held that Colwell did not show the NDOC's decision to delay or deny treatment caused him harm. This ignores the plain fact that as long as the eye remains untreated, Colwell continues to suffer blindness in his right eye, which is harm in and of itself, along with all of the other harms and dangers that flow from that. The record is sufficient to create a triable issue of fact regarding whether Colwell has been harmed by the refusal of treatment. *See Michaud*, 2012 WL 6720602, at *8–9 (plaintiff showed harm from delay of cataract surgery where his impairment resulted in fights with other inmates, causing "missing teeth and black eyes"). *Contra Layton*, 2012 WL 6969758, at *9 (disregarding collateral injury and holding that the visual acuity in plaintiff's good eye was the best measure of further injury since his cataract-affected eye was already totally blind).

In the district court's view, this is case about a difference of opinion over whether treatment is medically warranted. We disagree. "A difference of opinion between a physician and the prisoner—or between medical professionals— concerning what medical care is appropriate does not amount

to deliberate indifference." *Snow*, 681 F.3d at 987. Rather, "[t]o show deliberate indifference, the plaintiff 'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Id.* at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

In *Snow v. McDaniel*, which was decided shortly after the district court issued its decision in this case, an NDOC death row inmate brought an Eighth Amendment claim after the Utilization Review Panel repeatedly refused to authorize hip replacement surgery recommended by outside specialists and a treating physician. 681 F.3d at 983–84. The Panel denied surgery for approximately two years, concluding that the condition could be treated with pain medication even though it was an "emergency" and "potentially life threatening." *Id*. The *Snow* court held that "the circumstances . . . raise[d] an inference that the defendants were unreasonably relying on their own non-specialized conclusions" instead of the recommendations of the plaintiff's treating specialists. *Id.* at 986. Therefore, "a reasonable jury could conclude that the decision of the non-treating, non-specialist physicians to repeatedly deny the recommendations for surgery was medically unacceptable under all of the circumstances." *Id*. at 988; *see also Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992) ("By choosing to rely upon a medical opinion which a reasonable person would likely determine to be inferior, the prison officials took actions which may have amounted to the denial of medical treatment, and the 'unnecessary and wanton infliction of pain.'"), *overruled in part on other grounds as recognized in Snow*, 681 F.3d at 986.

The record in this case indicates that the NDOC similarly ignored the recommendations of treating specialists and instead relied on the opinions of non-specialist and non-treating medical officials who made decisions based on an administrative policy. Colwell was seen by eye specialists on at least two occasions, first by ophthalmologist Dr. Fischer in 2002 and then by a prison optometrist in 2009. Both specialists recommended cataract surgery after personally examining the cataract, yet the NDOC disregarded these recommendations.

The record supports a conclusion that the specialists' recommendations for surgery were overridden not because of conflicting medical opinions about the proper course of treatment, but because officials enforced the "one eye only" policy. The NDOC's formal cataract-treatment policy, Medical Directive 106, mandates "case by case" consideration of cataract treatment requests taking into account an inmate's "ability to function," but the evidence here shows that the NDOC denies cataract surgery as long as a prisoner has one "good" eye. Colwell was told on multiple occasions that he would not receive treatment because he had a healthy left eye, which made surgery unnecessary despite the examining specialists' opinions.

Facing similar facts, Nevada district courts have refused to grant summary judgment in favor of prison officials. In *Michaud*, the district court held that there was a genuine issue of fact whether the Utilization Review Panel was deliberately indifferent when it knew that the prisoner faced permanent blindness but denied the recommendation for cataract surgery and instead ordered an eye patch and headache pills. 2012 WL 6720602, at *7. The court explained that the facts indicated that every physician who reviewed the inmate's

vision concluded surgery was necessary, and that "the only difference of opinion existed between these physicians and the URP." *Id.* at *8.

Similarly, the *White* court held that there were triable issues of fact where there was a difference of opinion between "the optometric specialists at the eye clinic who recommended cataract removal and the defendants who claim the procedure is not necessary." 2010 WL 331742, at *5. The court reasoned that "a factual issue remain[ed] as to whether defendants surrendered professional judgment and dismissed complaints based on the mere categorization of cataract removal as 'not medically necessary.'" *Id.* at *6.[4]

The defendants ask us to disregard these cases and instead rely on *Cobbs*, an unpublished Sixth Circuit decision in which the court held that the Michigan Department of Correction's Chief Medical Officer was not deliberately indifferent when his Medical Committee denied a request for cataract surgery and refused a subsequent request for an ophthalmology consultation, despite specialist recommendations. 475 F. App'x at 581–84. Our case is distinguishable from this non-precedential, 2-to-1 Sixth Circuit case in at least one very important respect. Cobbs actually received the cataract

---

[4] The defendants want us to follow *Layton*, in which a Nevada district court found that there was no deliberate indifference based on facts and allegations very similar to those in the case. *See* 2012 WL 6969758, at *11. The report and recommendation in *Layton* relies in part on the district court's earlier grant of summary judgment in the instant case, *see id.* at *10, and the report and recommendations in both cases were prepared by the same magistrate judge. We find *Layton's* deliberate indifference analysis unpersuasive for many of the same reasons detailed in this opinion, but we agree with its conclusion that a cataract can amount to a serious medical need. *See id.* at *6.

surgery he needed after he filed his lawsuit. *Id.* at 579. He continued his suit afterward to recover damages for the *delay* in treatment. *Id.* at 576. Colwell, on the other hand, has been and *continues* to be denied the surgery that three different doctors say he currently needs. In any event, to whatever extent *Cobbs* can be read to condone the refusal to treat treatable cataracts solely because the inmate can still see out of one eye, we reject that view, as did Sixth Circuit Judge Cole. *Id.* at 584–85 (Cole, J., dissenting).

A reasonable jury could find that NDOC officials denied treatment because Colwell's medical need conflicted with a prison policy, not because non-treatment was a medically acceptable option. *See Hamilton*, 981 F.2d at 1066 (holding that summary judgment was inappropriate "where prison officials and doctors deliberately ignored the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner").

## 4. Personal Participation

The defendants urge us to uphold summary judgment because, they argue, neither Dr. Bannister nor former and now-retired NDOC Director Howard Skolnik was personally involved in any constitutional deprivation. *See Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) ("In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation . . . ."). The defendants never argued before the district court that Dr. Bannister lacked personal involvement, and the district court did not reach their arguments concerning Director Skolnik.

Although many of the events in this case occurred before Dr. Bannister became NDOC Medical Director in 2005, he personally denied Colwell's second-level grievance even though he was aware that an optometrist had recommended surgery and that Colwell's lower-level grievances had been denied despite that recommendation. Accordingly, a reasonable jury could find that Dr. Bannister, pursuant to a policy rather than a considered medical judgment, contributed to the decision to refuse treatment in conscious disregard of an excessive risk to Colwell's health. *See Snow*, 681 F.3d at 989–90.

There are no facts indicating Director Skolnik was personally involved in Colwell's medical care, but the current NDOC Director is still a proper defendant in Colwell's claim for injunctive relief "because he would be responsible for ensuring that injunctive relief was carried out, even if he was not personally involved in the decision giving rise to [the plaintiff's] claims." *Pouncil v. Tilton*, 704 F.3d 568, 576 (9th Cir. 2012). We have held that a corrections department secretary and prison warden were proper defendants in a § 1983 case because "[a] plaintiff seeking injunctive relief against the State is not required to allege a named official's personal involvement in the acts or omissions constituting the alleged constitutional violation. Rather, a plaintiff need only identify the law or policy challenged as a constitutional violation and name the official within the entity who can appropriately respond to injunctive relief." *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1127 (9th Cir. 2013) (citations omitted). Colwell contends that the NDOC Director would be responsible for implementing any injunctive relief and the defendants do not disagree.

## CONCLUSION

We therefore **REVERSE** the district court's grant of summary judgment in favor of the defendants and **REMAND** for further proceedings consistent with this opinion.[5]

---

BYBEE, Circuit Judge, dissenting:

Since 2002, John Colwell has been blind in his right eye as a result of a cataract. Prison doctors recommended that his condition be corrected by surgery, a request the Nevada Department of Corrections ("NDOC") denied in 2003. For the next five years, from 2004 to 2009, Colwell refused additional medical treatment by failing to show up for his annual physical. Not until 2010 did Colwell file grievances over the State's refusal to provide him with cataract surgery.

Colwell is one of the 20.5 million Americans over the age of 40 who suffer from cataracts.[1] Like many others who have

---

[5] We express no opinion regarding whether the defendants are entitled to qualified immunity on Colwell's claim for damages, leaving the district court to address that issue in the first instance. *See Richardson v. Runnels*, 594 F.3d 666, 672 (9th Cir. 2010) ("Here, we do not reach qualified immunity because the issue has never been addressed by the district court."); *Schneider v. Cnty. of San Diego*, 28 F.3d 89, 93 (9th Cir. 1994) ("The district court granted summary judgment without reaching the immunity issues. These issues should be addressed in the first instance by the district court.").

[1] Centers for Disease Control and Prevention, *Common Eye Disorders*, (Apr. 23, 2013) www.cdc.gov/visionhealth/basic_information/eye_disorders.htm.

cataracts, he is in no pain and in no danger of suffering permanent loss of vision.  In the nine years after he developed the cataract, Colwell worked in prison industries sewing mattresses, doing yard work, training dogs, and serving in the culinary unit.  He routinely participates in religious activities, plays cards, attends a computer class, exercises, and watches television; he is also a "voracious reader."  His only complaint relative to the blindness in his right eye is that, since he developed the cataract in 2002, he ran his hand through a sewing machine (twice), gashed his head on a concrete block, bonks his head on the upper bunk, and occasionally bumps into other inmates.

If I were the warden, and if I had the resources at my disposal, I would make sure that Colwell got his elective surgery.  But that is not the question before us.  The question is whether the State's refusal to obtain surgery for Colwell's eye constitutes "cruel and unusual punishment" in violation of the Eighth Amendment.  The majority answers with a resounding "yes," but I fear that the answer is not as facile as the majority makes it out to be.  It turns out that we, district courts in our circuit, and courts around the United States have struggled with this question.  And with good reason.  We have a growing—and, more importantly, an aging—prison population, and we are going to face these kinds of problems more and more frequently.  The big question for us as courts is the extent to which the Eighth Amendment dictates the answers to these problems.

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court applied the Eighth Amendment's prohibition against "cruel and unusual punishments" to "the government's obligation to provide medical care for those whom it is punishing by incarceration."  *Id.* at 103.  Although "not . . .

every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment," the Constitution proscribes "'unnecessary and wanton infliction of pain'" through "deliberate indifference to serious medical needs of prisoners." *Id.* at 104–05 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). Judged by this standard, NDOC has not violated the Eighth Amendment, because Colwell is not suffering any pain from his cataract and he is fully functioning in the ordinary tasks of prison life. His mishaps are not unexpected given the vicissitudes of life, the aging process, and his incarceration.

Our court has construed the "serious medical needs" standard in *Estelle* to go well beyond medical conditions that cause pain. In *McGuckin v. Smith*, we held that a "serious medical need" encompassed any "injury that reasonable doctor or patient would find important and worthy of comment or treatment." 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997). Relying on this standard—a standard better suited for counseling doctors how to avoid malpractice claims—the majority has little difficulty concluding that the State has violated the Eighth Amendment. Maj. Op. at 9–10, 13. But *McGuckin* cannot be a correct reading of the Court's Eighth Amendment cases, and unless we overturn it en banc, we will make ourselves the authors of a "National Code of Prison Regulation," *Hudson v. McMillian*, 503 U.S. 1, 28 (1992) (Thomas, J., dissenting), the ombudsmen for the circuit's prisons, and the arbiters of acceptable medical standards. These problems, however, are much too complicated to be addressed through the blunt force of the Eighth Amendment.

I respectfully dissent.

# I

## A

The Supreme Court first addressed the Eighth Amendment in *Wilkerson v. Utah*, 99 U.S. 130 (1878), a challenge to the Utah Territory's plan to execute Wilkerson by firing squad.[2] The Court held that capital punishment did not violate the Eighth Amendment, but observed that drawing and quartering, public dissection, burning alive, disembowelment, and all other punishments "in the same line of unnecessary cruelty," are forbidden by the Constitution. *Id.* at 135–37. Later Court decisions described cruel and unusual punishments as those that "involve torture or a lingering death," *Weems v. United States*, 217 U.S. 349, 370 (1910), or the "wanton infliction of pain." *Gregg*, 428 U.S. at 173 (discussing *Furman v. Georgia*, 408 U.S. 238, 392–93 (1972) (Burger, C.J., dissenting)); *see also Baze v. Rees*, 553 U.S. 35, 48–49 (2008) (plurality opinion); *In re Kemmler*, 136 U.S. 436 (1890).

Over the course of these early cases, the Court shifted from a focus on historically prohibited punishments to a broader recognition that the Eighth Amendment is not a "static concept." *Gregg*, 428 U.S. at 173. Although this shift expanded the breadth of the Eighth Amendment, the Court cautioned that "the requirements of the Eighth Amendment must be applied with an awareness of the limited role to be

---

[2] The Supreme Court did not even mention the Eighth Amendment until the middle of the Nineteenth Century. *See Pervear v. Massachusetts*, 72 U.S. 475, 479–80 (1866) (acknowledging Pervear's Eighth Amendment argument, but declining to address the issue because the Eighth Amendment did not apply to the states).

played by the courts." *Id.* at 174. After all, "[c]ourts are not representative bodies," *id.* at 176 (internal quotation marks omitted), and "[a] decision that a given punishment is impermissible under the Eighth Amendment cannot be reversed short of a constitutional amendment." *Id.* at 175. Cognizant of these warnings, the Court nevertheless expanded the reach of the Eighth Amendment beyond punishments themselves, and into conditions of imprisonment, beginning with inmate health care.

The government's obligation to provide inmates with medical care follows from *Gregg's* holding that the Eighth Amendment prohibits the "wanton infliction of pain." *Id.* at 173. During the same Term it decided *Gregg*, the Court in *Estelle* considered for the first time whether the Eighth Amendment applied to prison conditions. 429 U.S. 97. The Court held that the government has an obligation to provide medical care for incarcerated people because failure to do so "may actually produce physical 'torture or a lingering death,'" or "pain and suffering" without "any penological purpose." *Id.* at 103 (quoting *Kemmler*, 136 U.S. at 447, and discussing *Gregg*, 428 U.S. at 173). Cautioning that "every claim by a prisoner that he has not received adequate medical treatment [does not] state[ ] a violation of the Eighth Amendment," the Court held that the Eighth Amendment prohibits "deliberate indifference to serious medical needs of prisoners." *Id.* at 105.

Since then, the Court has repeated that "'deliberate indifference to serious medical needs of prisoners' violates the [Eighth] Amendment because it constitutes the unnecessary and wanton infliction of pain contrary to contemporary standards of decency." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (quoting *Estelle*, 429 U.S. at 104).

Thus, "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (internal quotation marks omitted); *see also Hope v. Pelzer*, 536 U.S. 730, 737–38 (2002); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Hudson*, 503 U.S. at 5 (referring to "the settled rule that the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." (omission in original) (internal quotation marks omitted)); *Whitley v. Albers*, 475 U.S. 312, 320 (1986) ("After incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment" (omission in original) (internal quotation marks omitted)). In *Rhodes v. Chapman*, 452 U.S. 337 (1981), the Court considered whether "conditions of confinement"—in that case, double celling—were cruel and unusual punishment. The Court again emphasized that the wanton and unnecessary infliction of *pain* was the touchstone of the Eighth Amendment:

> The double celling made necessary by the unanticipated increase in prison population did not lead to deprivations of essential food, medical care, or sanitation. Nor did it increase violence among inmates or create other conditions intolerable for prison confinement. Although job and education opportunities diminished marginally as a result of double celling, limited work hours and delay before receiving education *do not inflict pain, much less unnecessary and wanton pain*; deprivations of this kind simply are not punishments. We would have to wrench the Eighth Amendment from its

> language and history to hold that delay of
> these desirable aids to rehabilitation violates
> the Constitution.

*Id.* at 348 (internal citation omitted) (emphasis added). The Court concluded that the complaints "f[e]ll far short in themselves of proving cruel and unusual punishment, for there is no evidence that double celling under these circumstances either inflicts unnecessary or wanton pain or is grossly disproportionate to the severity of crimes warranting imprisonment. . . . [T]he Constitution does not mandate comfortable prisons," or that prisoners "be free of discomfort." *Id*. at 348–49.

## B

Our own foray into the Eighth Amendment has departed significantly from the Court's formulation. Initially, we followed *Estelle* and held that prisoners "can establish an eighth amendment violation with respect to medical care if they can prove there has been deliberate indifference to their serious medical needs" such that it caused "unnecessary and wanton infliction of pain." *Hunt v. Dental Dep't.*, 865 F.2d 198, 200–01 (9th Cir. 1989) (internal quotation marks and citation omitted); *see also Vaughn v. Ricketts*, 859 F.2d 736, 741 (9th Cir. 1988); *Anthony v. Dowdle*, 853 F.2d 741, 742–43 (9th Cir. 1988); *Wood v. Sunn*, 852 F.2d 1205, 1210 (9th Cir. 1988); *May v. Enomoto*, 633 F.2d 164, 167 (9th Cir. 1980). In 1992, however, we grafted a different formulation on the Supreme Court's holding in *Estelle*. *McGuckin*, was a case involving a prisoner who endured "a significant amount of pain and anguish" caused by a hernia because prison officials failed to diagnose his condition. 974 F.2d at 1061–62. There, as in *Hunt*, we correctly observed that the

"'[u]nnecessary and wanton infliction of pain' upon incarcerated individuals under color of law constitutes a violation of the Eighth Amendment." *Id.* at 1059 (quoting *Hudson*, 503 U.S. at 5) (alteration in original). We explained that "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs" in order to state a cognizable Eight Amendment claim, and that "[a] 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Id.* (quoting *Estelle*, 429 U.S. at 104). We then expanded upon *Estelle* as follows:

> The existence of *an injury that a reasonable doctor or patient would find important and worthy of comment or treatment*; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment.

*Id.* at 1059–60 (emphasis added).

We have since relied on *McGuckin's* "worthy of comment" standard, but have done so in just two published cases,[3] and it is not clear that either case depended on such a

---

[3] It appears in a dozen or so of our unpublished opinions. *See*, *e.g.*, *Padilla v. Crawford*, 288 Fed. App'x. 389, 391 (9th Cir. 2008). Many district courts within our circuit have cited to *McGuckin* as well. At least four circuits have cited *McGuckin's* comment-worthiness standard, although it is unclear whether those circuits require proof of pain as well. *See*, *e.g.*, *Blackmore v. Kalamazoo Cnty*, 390 F.3d 890, 897 (6th Cir. 2004) ("Most other circuits hold that a medical need is objectively serious

broad rephrasing of the Supreme Court's standard. *See Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citing *McGuckin* for the proposition that a hernia is "'an injury that reasonable doctor or patient would find important and worthy of comment or treatment,'" 974 F.2d at 1059–60; but also citing *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986) ("He alleges suffering and pain from his herniated condition . . . .")); *see also Lopez v. Smith*, 203 F.3d 1122, 1131–32 (9th Cir. 2000) (en banc) (concluding that post-operative care for jaw that was broken and wired shut was "the kind of injury a doctor would find noteworthy" and was "likely painful"). But more frequently, we have resorted to the standard statement that "the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotation marks omitted); *see also Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012) ("To meet the objective standard, the denial of a plaintiff's serious medical need must result in the 'unnecessary and wanton infliction of pain.'" (quoting *Estelle*, 429 U.S. at 104)), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc); *Hallett v. Morgan*, 296 F.3d 732, 744–45 (9th Cir. 2002); *Wakefield v. Thompson*, 177 F.3d 1160, 1164–65 (9th Cir. 1999). Most recently, we stated that "[a] medical need is serious if failure to treat it will result in

---

if it is one that has been diagnosed by a physician . . . *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.") (internal quotation marks omitted); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (describing comment-worthiness as a "highly relevant" consideration); *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997) (describing *McGuckin* as "sensible"); *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996).

'significant injury or the unnecessary and wanton infliction of pain.'" *Peralta*, 744 F.3d at 1081(quoting *Jett*, 439 F.3d at 1096).

The majority relies on the "worthy of comment" statement from *McGuckin*.[4] The majority first recites our statement from *McGuckin*, Maj. Op. at 10, and then applies it: "Several doctors, including an ophthalmologist and an optometrist, have found the cataract and resulting vision loss 'important and worthy of comment or treatment.'" Maj. Op. at 13 (quoting *McGuckin*, 974 F.2d at 1059). From this, and the anecdotal evidence that he has injured himself because of his monocular blindness, the majority concludes that "Colwell's total blindness in one eye is a serious medical need." Maj. Op. at 13. The majority makes no claim that Colwell suffers from any pain attributable to his medical condition.

Our assertion in *McGuckin*, 974 F.2d at 1059, relied on by the majority here, that "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment" is a "serious medical need" covered by the Eighth Amendment has no provenance in any case that I can find. And the comment-worthiness standard is untethered from the Supreme Court's insistence that the Cruel and Unusual Punishments Clause has at its core the infliction of "unnecessary and wanton pain." Moreover, so far as I can determine, this is the first time we have a case in which the comment-worthiness standard really matters.

---

[4] The majority does not, and could not, rely on the other examples of serious medical needs cited in *McGuckin*: a medical condition that "significantly affects" an inmate's daily activities or "chronic and substantial pain." *McGuckin*, 974 F.2d at 1060.

We have adopted the wrong standard. In the end, *McGuckin's* comment-worthiness standard does not follow from the Supreme Court's jurisprudence. The touchstone for Eighth Amendment violations has always depended on some showing that the punishment, the conduct of prison and medical officials, or the conditions of confinement have resulted in the "the unnecessary and wanton infliction of *pain*." *See Wilson*, 501 U.S. at 297 (internal quotation marks and emphasis omitted) (emphasis added); *Hudson*, 503 U.S. at 5; *Whitley*, 475 U.S. at 320; *Rhodes*, 452 U.S. at 348; *Estelle*, 429 U.S. at 104; *see also Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Making the Eighth Amendment turn on a doctor's notes does not approach this touchstone. Doctors may comment on patient's conditions for many reasons unrelated to pain. Doctors have an obligation to diagnose symptoms of physical and mental illnesses. Sometimes the body sends imperfect or mixed signals. Doctors will frequently tell us that a condition "bears watching." Sometimes we go to doctors for matters that are inconvenient or cosmetic. Sometimes we will have complaints—real or imagined—that the doctor cannot verify. Our complaints may be medically noteworthy even if they fall well short of threatening our lives or causing us temporary or persistent pain.

Our *McGuckin* comment-worthiness standard is all the more troubling because it does not even depend on a *doctor* thinking the matter is worthy of comment. Under *McGuckin*, it is sufficient if the "*patient* would find [the injury] important and worthy of comment or treatment." *McGuckin*, 974 F.2d at 1059 (emphasis added). After *McGuckin*, a patient may self-report an Eighth Amendment violation based on his own

perception of what is "important and worthy of comment or treatment." No medical diagnosis is required.

II

It is understandable that the majority bases much of its serious medical need analysis on *McGuckin's* comment-worthiness standard because Colwell's cataract does not cause the "wanton infliction of pain." *Gregg*, 428 U.S. at 173. But I cannot agree with the majority that Colwell has endured "cruel and unusual punishment" simply because the doctors commented on his cataract and recommended that it be corrected surgically. Given the importance of medical records, it would be surprising if the medical professionals had failed to document his cataract or monocular blindness.

Although Colwell's doctors noted his cataract, no one documented that the cataract caused Colwell any pain or discomfort. Nor did anyone suggest that Colwell was significantly limited in his life's activities. Nor does the record support such a conclusion. In his deposition, Colwell does not complain of any pain or discomfort from his cataract. The State's doctors confirmed that cataracts do not generally cause pain. Dr. Scott wrote that "[a] cataract does not cause pain. Plaintiff did not complain of any pain due to his cataract." Dr. Bannister confirmed that "[a] cataract does not cause pain." Nor does the cataract pose any direct threat to Colwell's physical well-being. Dr. Bannister's declaration states "a cataract is not a condition that constitutes a medical emergency, nor does a cataract require urgent medical attention. . . . A cataract does not lead to permanent vision loss." Dr. Scott stated that Colwell "had documented normal vis[ion] in his left eye. Non-intervention to the right eye cataract presented no further health risks to the Plaintiff." He

further observed that "[w]hile any cataract can be removed surgically, the removal of a cataract is not medically necessary in many cases because the cataract does not structurally damage the eye."

Even though Colwell is not in any physical pain, the untreated cataract and his resulting blindness may create a condition of his confinement that causes unnecessary pain and suffering. The majority so concludes:

> [T]he evidence showed that Colwell was not "merely blind" in one eye, but that his monocular blindness caused him physical injury: He ran his hand through a sewing machine on two occasions while working in the prison mattress factory; he ran into a concrete block, splitting open his forehead; he regularly hits his head on the upper bunk of his cell; and he bumps into other inmates who are not good-natured about such encounters, triggering fights on two occasions.

Maj. Op. at 13.

None of these incidents withstands scrutiny. Let's start with the sewing machine incidents. The evidence that Colwell ran his hand through a sewing machine comes from a 2003 medical consultation report.[5] It reads: "P[atient] has run his hand through sewing machine twice this past 10 months." Colwell sewed mattresses in a prison workshop

---

[5] As the majority states, Colwell's medical records filed under seal remain under seal except as to facts discussed herein, in the majority's opinion, or in the parties' briefs. Maj. Op. at 6 n.1.

from 2000 to 2009, except for 2004. At no time in his deposition (or in his complaint) did Colwell mention running his hands through a sewing machine. In his deposition, Colwell generally complained that he "was having trouble with [his] sewing ability," and could not continue "working in a mattress factory where [he was] required to do very fine work." When the mattress operation was moved to another correctional facility, Colwell decided to quit and leave that facility. "Well, my work was being adversely affected, on top of I didn't like it there. So I exercised my right to be transferred." If there was a problem in 2003, it was not of sufficient concern to Colwell to seek medical attention. Colwell refused his annual medical examinations for the next five years, from 2004 to 2008, because he "[didn't] like the medical department in general." There is nothing in Colwell's allegations or deposition that would connect these incidents to his cataract.

The evidence of Colwell "splitting open his forehead" does not tell us much either. Colwell testified that in 2011 he was bending over and "split [his] eye open, [his] left eyebrow, on a cement block." Of course, as he acknowledged, the left side was "on the side that [he could] see," but he thought "something [wa]s out of whack." He reported the incident to an officer, who told him to report to the medical unit. Colwell thought the medical unit was going to charge him for the visit, so he refused. By the time he got to the medical unit, within ten minutes of the incident, he was not bleeding:

Q: Did you require any stitches?

A: No.

Q: Did you get a Band-Aid?

A: No.

The majority also relies on the fact that Colwell regularly hits his head on the upper bunk. Colwell, by the way, is 6'6" and weighs 270 lbs. And as Colwell recognizes, he has "a lower bunk and the upper bunk is probably four and a half feet high." There are "always scratches and breaks on the back of [his] head," but he has never required treatment for bumping his head. This is unfortunate, but ask any taller-than-average person who has had to sit on a bus or an airplane or cram into desks or beds that are too short and they will testify that these are the natural consequences of being tall. Additionally, Colwell himself candidly recognized that it might be a consequence of getting older: "I don't know how much of it is just being senile and old, you know, but it happens."

Finally, the majority points to the claim that Colwell bumps into other inmates and that this has resulted in at least two fights. Here is what Colwell said: "I have had two fistfights and numerous occasions where I have had to apologize." However, Colwell has no disciplinary history of fighting. As Colwell explains, "[they]'re in very crowded spaces. There's a limited amount of area that [they] can walk, that [they] can live." One of the incidents was in 2007 or 2008, and Colwell and his antagonist each threw a punch and then engaged in some shoving. Neither suffered any injuries, and the incident was not reported. The second incident occurred in 2009. Colwell walked into another prisoner on his right side. The man later confronted Colwell and, because Colwell was bigger and stronger, he just "took care of it," later apologizing to the man. Again, there were no

injuries and no reports filed.  Aside from these two fights, Colwell testified that he "probably run[s] into somebody two or three times a month, and probably one in five or one in six requires an explanation."  He attributes these run-ins to his cataract because they always occur on his right side.  By Colwell's own estimate, he has to apologize to someone he runs into about once every other month.  Given the confined space in which prisons operate and Colwell's physical size, having to apologize once every two months for bumping into to someone doesn't seem the stuff of cruel and unusual punishment.

In other respects, Colwell's activities demonstrate that he is relatively unrestricted in his life.  He testified that he meditates and participates in religious services.  He plays cards and attends a computer class.  He describes himself as "a voracious reader. [He] reads a book a day very often when [he's] doing well."  He says that he exercises regularly by walking, but cannot participate in sports because he can no longer shoot baskets, play pool, or catch a baseball.

Taken together, these incidents do not amount to the kind of pain and suffering necessary to challenge the conditions of his confinement under the Eighth Amendment.

### III

Because Colwell does not suffer any physical pain from his cataract and does not suffer generally from his monocular blindness, the majority's decision is only supportable if monocular blindness is *per se* a serious medical need.  Although the majority does not say as much, that is the undeniable take-away from its opinion, and prisons within the circuit will refuse elective cataract surgery at their peril.  *See*

Maj. Op. at 11 ("[M]onocular blindness is a serous medical need."); *id.* at 14 ("Colwell continues to suffer blindness in his right eye, which is harm in and of itself, along with all of the other harms and dangers that flow from that.").

Let there be no question that I believe that monocular blindness is a serious condition. And if I had monocular blindness and the means to cure it, I would surely do so. But if the bare fact of being blind in one eye may be considered a disability,[6] it is not crippling. There are many Americans who have monocular vision and are perfectly functional. They hold jobs, drive cars,[7] play sports, watch movies, and

---

[6] The majority advises that the Supreme Court considers monocular vision to be a disability under the Americans with Disabilities Act. Maj. Op. at 12 n.3 (citing *Albertsons, Inc. v. Kirkingburg*, 527 U.S. 555, 566–67 (1999)); *see also EEOC v. United Parcel Serv., Inc.*, 424 F.3d 1060, 1064–65 (9th Cir. 2005).

The majority's reference to the ADA is odd because the ADA serves a very different purpose from the Eighth Amendment. The ADA is a broad law designed "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). In addition to eliminating discrimination, the ADA seeks to improve quality of life for disabled individuals by improving accessibility. *See Chapman v. Pier 1 Imps. (U.S.) Inc.*, 631 F.3d 939, 945 (9th Cir. 2011) ("[T]he ADA proscribes more subtle forms of discrimination . . . that interfere with disabled individuals' full and equal enjoyment of places of public accommodation." (internal quotation marks omitted)). By contrast, the Eighth Amendment is not "an aspiration toward an ideal environment for long-term confinement." *Rhodes*, 452 U.S. at 349.

[7] The vast majority of states grant drivers licenses to individuals with monocular vision. *See* Paul G. Steinkuller, MD, *Legal Vision Requirements for Drivers in the United States*, 12 Am. Med. Ass'n J. of Ethics 911, 938 (Dec. 2010), *available at* virtualmentor.ama-assn.org/2010/12/pdf/hlaw1-1012.pdf. Furthermore, a study of individuals

move among the binocular population without us even being aware of their condition.[8]

This same question, whether a cataract resulting in partial or total blindness constitutes a serious medical condition, has vexed the courts that have considered it. The majority cites to several courts who have found that cataracts are a serious medical need and that the prisons are obligated to treat it. *See* Maj. Op. at 11–13 & n.3. The record is more mixed than the majority admits. As the majority points out, a number of courts, including district courts in our circuit (largely in Nevada), have held that cataracts are a "serious medical condition" for purposes of the Eighth Amendment. *See*, *e.g.*, *Cobbs v. Pramstaller*, 475 F. App'x 575 (6th Cir. 2012); *Michaud v. Bannister*, No. 2:08-CV-01371-MMD-PAL, 2012 WL 6720602 at *4–6 (D. Nev. Dec. 26, 2012); *Morris v. Corr. Med. Servs.*, No. 2:07-CV-10578, 2012 WL 5874477 at *3 (E.D. Mich. Nov. 20, 2012) ("[A] lay person would easily recognize the necessity for a doctor to extract a cataract."); *Layton v. Bannister*, No. 3:10-CV-00443-LRH-WGC, 2012 WL 6969758 at *6 (D. Nev. Sept. 28, 2012)

who suffered sudden monocular blindness adjusted to driving, working, recreation, home activities, and walking within one month of the sudden loss. John V. Linberg, M.D., et al., *Recovery After Loss of an Eye*, 3 Ophthalmic Plastic & Reconstructive Surgery, 135, 135–38 (1988). Of those studied, 93% were fully adjusted within a year. *Id.* In a study of 125 monocular patients, 85 out of 125 said that loss of vision had not changed their lives in any permanent way. *Id.*

[8] A list of well known monocular persons might include leaders such as Moshe Dyan, Theodore Roosevelt, and Mo Udall; writers such as James Joyce, William Shirer, and Alice Walker; and entertainers such as Sandy Duncan, Peter Falk, Rex Harrison, Claude Rains, Sammy Davis Jr., and Johnny Depp. *See, e.g.*, LostEye, *Success After the Loss of an Eye*, www.losteye.com/oneeyers.htm (last visited Aug. 1, 2014).

(finding that the referral for surgery was "evidence of an injury that a reasonable doctor would find important and worthy of comment or treatment" while relying on *McGuckin*); *Hunt v. Mohr*, No. 2:11-CV-00653, 2012 WL 1537294 at *4 (S.D. Ohio May 1, 2012) (cataracts constitute a serious medical need); *White v. Snider*, No. 3:08-CV-252-RCJ (VPC), 2010 WL 331742 (D. Nev. Jan. 26, 2010); *Garcia v. Nev. Bd. of Prison Comm'rs*, No. 3:06-CV-0118-JCM (VPC), 2008 WL 818981 (D. Nev. Mar. 24, 2008).[9]

On the other hand, a comparable number of courts—including our court—have held that cataracts may *not* be a serious medical condition. *See, e.g.*, *Hummer v. Schriro*, 407 F. App'x 112, 113 (9th Cir. 2010) ("Hummer failed to present evidence showing that the defendant's denial of cataract surgery in his right eye has caused or will cause further injury, or that the defendants knew of other serious pain or medical problems caused by Hummer's cataract"); *Thomas v. Stephens*, No.7:10-CV-00090, 2011 WL 1532150, at *4 (W.D. Va. Apr. 4, 2011) ("Plaintiff fails to establish that his cataract constitutes a serious medical need under the Eighth Amendment because the record does not demonstrate a 'substantial risk' of serious harm or permanent disability."); *Dupuis v. Caskey*, No. 4:08CV63-LRA, 2009 WL 3156527, at *4 (S.D. Miss. Sept. 28, 2009) (finding no deliberate indifference because cataract surgeries are considered

---

[9] Some of these cases have facts that present a much stronger case for an Eighth Amendment violation than Colwell's. For example, in *Cobbs*, the inmate's treating doctor advised that cataract surgery was necessary "to prevent secondary glaucoma," and that delayed cataract removal would make surgery more complicated. 475 F. App'x at 578, 582. Similarly, the inmate in *Michaud* suffered from a cataract that caused him severe headaches, and doctors advised that the cataract could cause glaucoma or permanent blindness. *Michaud*, 2012 WL 6720602, at *1, 4.

elective (citing the American Optometric Association's Optometric Clinical Practice Guidelines)); *Hurt v. Mahon*, No. 1:09CV958(LO/JFA), 2009 WL 2877001, at * 2 (E.D. Va. Aug. 31, 2009) ("[I]t is doubtful that a cataract is a sufficiently serious medical need to support an Eighth Amendment violation."); *Wilson v. Turner*, No. 6:08-CV-06056, 2009 WL 1634894, at * 6 (W.D. Ark. June 10, 2009) (holding that cataract surgery was neither an emergency nor a medical necessity)*; Rylee v. Bureau of Prisons*, No. 8:08-CV-1643-PMD-BHH, 2009 WL 633000 at *4 (D.S.C. Mar. 9, 2009) (BOP decision not to secure cataract surgery until the remaining eye deteriorated further was not deliberate indifference); *Williams v. Shelton*, No. 06-95-KI, 2008 WL 2789031, at *3 (D. Or. July 16, 2008) (delay in providing cataract surgery on second eye was not deliberate indifference); *see also Samonte v. Bauman*, 264 F. App'x 634, 635 & n.1 (9th Cir. 2008) (finding that delay before conducting cataract surgery was not deliberate indifference and declining to reach the issue whether there was "a serious medical need"); *United States v. Schuett*, No. 2:-LO-CR-118-RLH-RJJ, 2014 WL 289433 (D. Nev. Jan. 27, 2014) (declining to order the early release of the inmate so he could have cataract surgery in both eyes); *Phillips v. Lindamood*, No. 3:09-1187, 2009 WL 5205379 (M.D. Tenn. Dec. 23, 2009) (doctor who declined to perform cataract surgery on a second eye was not deliberately indifferent); *Espinosa v. Saladin*, No. 1:08-CV-736, 2009 WL 3102483, at *3 (W.D. Mich. Sept. 23, 2009) (denial of cataract surgery where inmate had acceptable vision in his remaining eye was not deliberate indifference); *Stevenson v. Pramstaller*, 2009 WL 804748 (E.D. Mich. Mar. 24, 2009).

What these cases demonstrate is that the question of whether a cataract constitutes a "serious medical condition"

has been a difficult and controversial one. The courts have divided, and they have examined each case on its own facts. No court has taken the step that ours takes today of pronouncing that a cataract resulting in monocular blindness is, categorically, a serious medical condition that the states must correct under the Eighth Amendment. These cases, from courts in the Fourth, Fifth, Sixth, Eighth, and Ninth Circuits also tell us something about how the nation's prisons have addressed the problem: Nevada is not alone in its decision to address cataracts on a case-by-case basis, rather than categorically. That should also tell us, as I explain in the next section, that our court has gotten well in front of our "evolving standards of decency." *Rhodes*, 452 U.S. at 346 (internal quotation marks omitted); *see also id.* ("[N]o static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual.").

IV

"Deliberate indifference is a high legal standard," *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004), that is only "satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett*, 439 F.3d at 1096. Deliberate indifference does not include failure to treat a condition that is not serious. *See Estelle*, 429 U.S. at 104–05; *see also Farmer*, 511 U.S. at 837 (Deliberate indifference requires that a prison official "knows of and disregards an *excessive* risk to inmate health or safety." (emphasis added)); *Peralta*, 744 F.3d at 1081–82. It also does not include "mere negligence in diagnosing or treating a medical condition," *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988), or a difference of medical opinion, *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). Nor does

deliberate indifference include a "mere delay of surgery . . . unless the denial was harmful." *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). In sum, "the offending conduct must be *wanton*." *Wilson*, 501 U.S. at 302.

Colwell cannot satisfy either of these conditions. He does not "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs," *Estelle*, 429 U.S. at 106, and he cannot show that the denial of cataract surgery caused any harm. NDOC's decision was a reasonable one.

## A

The majority holds that "the blanket, categorical denial" of cataract surgery solely on the basis of an administrative policy is "the paradigm of deliberate indifference." Maj. Op. 3–4. I agree with the majority that "blanket policies" may run afoul of the Eighth Amendment. Even the State "agrees that a medical policy that is divorced from an inmate-patient's medical needs would be constitutionally defective." But here, the majority's description of Medical Directive 106 is erroneous because it is not a blanket "one good eye policy."

Although Colwell and the majority repeatedly refer to Medical Directive 106 as a "one good eye policy," that phrase appears nowhere in the Directive or in the official responses that Colwell received. The evidence for such an explicit policy is all hearsay. It was Colwell who first complained that doctors and a nurse told him there is a "one good eye policy." That claim is belied by the record, both the official published policy and the way in which NDOC treated Colwell's request. NDOC has published protocols for

medical conditions and a directive specifically for cataracts. Medical Directive 106, entitled "Cataracts" states as follows: "It is the policy of the Department that inmates with cataracts will be evaluated on a case by case basis, taking into consideration their ability to function within their current living environment."[10] With respect to "[s]urgical removal of cataracts," Medical Directive 106 provides that "[p]atients with visual impairment incompatible with the ability to perform the required tasks of daily living in their current living environment may be considered for removal of a cataract."

Moreover, Colwell's experience demonstrates that Nevada has not categorically refused Colwell treatment. In fact, Nevada provided Colwell with corrective cataract surgery on his left eye in 2001. In response to his grievances filed in 2010 (the latest for which we have a record), he was denied his request for surgery at the informal level of review because his remaining eye was "corrected to 20/20 vision," which put any surgery in a "non-essential category." At the first level of review, NDOC repeated that his surgery was "at present non-essential. Your one eye is corrected to 20/20." At the second, and final level of review, NDOC stated that "[i]n almost [all] cases cataract surgery is not an emergency. You should be evaluated periodically to determine the degree of impairment caused by your cataract with regard to your ability to perform the activities required in your current living

---

[10] Ironically, Medical Directive 106 is quite consistent with *McGuckin's* alternative description of a serious medical condition as "a medical condition that significantly affects an individual's daily activities." *McGuckin*, 974 F.2d at 1060. The majority, of course, makes no claim that Colwell's condition significantly affects his daily activities.

situation. Based on the practitioner[']s evaluation the request can be re-considered."

Case-by-case policies such as Nevada's are fully consistent with accepted medical and prison practices. Indeed, Nevada's policy appears to be more generous than the comparable federal policies. The Federal Bureau of Prison's "Opthalmology Guidance" provides that *"emergent or urgent* ophthalmologic surgeries should never be delayed" and that "all *elective* ophthalmologic surgery, including surgery for cataracts" must be approved by the Regional Medical Director. Federal Bureau of Prisons, *Ophthalmology Guidance* 5 (Feb. 2008), available at www.bop.gov/resources/pdfs/opthamology_guidance_2008.pdf. The criteria for that decision are:

> **Cataract Surgery:** There must be documentation of a best-corrected visual acuity of less than 20/60 in both eyes with current (less than six months old) refraction. Second eye surgery requires a documented, best-corrected visual acuity of 20/100 or less.

*Id.* BOP will consider special circumstances, such as the need for "retinal visualization (i.e., not for improvement in vision)." *Id.* at 6.[11] Similarly, the United States Marshals

---

[11] These guidelines were at issue in *Rylee v. Bureau of Prisons*, 2009 WL 633000. In *Rylee*, the inmate had a cataract in his right eye that was rapidly progressing. *Id*. at \*2. His optometrists recommended that he receive cataract surgery, but Rylee did not come within BOP's guidelines because his good left eye had visual acuity of 20/60 or better. *Id.* Rylee was not in pain, and the doctors stated that delaying any surgery would not cause any irreparable damage to the eye. *Id.* at \*4. They also stated that when Rylee's vision was less than 20/60 for six months "and his condition

Service classifies cataract surgery as elective and a "non-authorized medical intervention/procedure." Cataract surgery will not be authorized payment unless ordered by a court or pre-authorized by the Office of Interagency Medical Services. U.S. Marshals Service, *Prisoner Health Care Standards* 2, 13, 16 (Nov. 2007), *available at* www.usmarshals.gov/foia/ Reading_Room_Information/Publications/prisoner_health_ care_standards.pdf

The states within our circuit have similar policies. Washington, for example, has a policy quite close to the BOP's. It authorizes care for an inmate's "[w]orst one eye if both eyes have best corrected [visual acuity] <20/60" or "[e]ither or both eyes if inadequate visualization of retina for screening, management, or monitoring of another disease, e.g. diabetic retinopathy." Washington Dep't of Corrs., *Offender Health Plan* 17. Like Nevada, Oregon provides that the treatment of cataracts is classified as "[m]edically [a]cceptable but not [m]edically [n]ecessary" and that treatment "[w]ill be authorized on an individual-by-individual basis or a problem-by-problem basis." The factors Oregon will consider include "[w]hether the surgery/procedure could be or could not be reasonably delayed without causing a significant progression, complication, or deterioration of the condition," the "[m]edical necessity – the overall morbidity and mortality of the condition if left untreated," and the "[p]ain [c]omplaints/[p]ain [b]ehaviors." Oregon Dep't of

---

interferes with his activities of daily living, Mr. Rylee [would] be considered for cataract surgery." *Id.* The district court granted judgment for the defendants because "the record, in no way, reflect[ed] that Defendants exhibited deliberate indifference to Plaintiff's condition Defendants' decision to adhere to federal prison guidelines rather than follow the optometrist's recommendation of cataract surgery constitute[d] a difference of medical opinion." *Id.*

Corrs., *Health Servs. Section Policy and Procedure* #P-A-02.1.B.3.C). Alaska likewise describes corneal transplants for cataracts as "[m]edically [a]cceptable *but not* [m]edically [n]ecessary." Alaska Dep't of Corrs., *Prisoner Health Plan* 7 (June 26, 2002).**[12]** California does not mention cataracts specifically but has a general policy of "only provid[ing] medical services for inmates, which are based on medical necessity." Cal. Code Regs. tit. 15, § 3350(a) (2014). "Medically [n]ecessary means health care services that are determined by the attending physician to be reasonable and necessary to protect life, prevent significant illness or disability, or alleviate severe pain." *Id*. at tit. 15, § 3350(b)(1). "Significant illness and disability" means "any medical condition that causes or may cause if left untreated a severe limitation of function or ability to perform the daily activities of life or that may cause premature death." *Id*. at tit. 15, § 3350(b)(5).**[13]**

---

**[12]** Alaska's general policy provides that prisoners have "the right to receive essential health care services." These services include medical services when a healthcare provider concludes that (1) the prisoner's symptoms indicate "a serious disease or injury" (2) that "treatment could cure or substantially alleviate" and (3) there is either "potential for harm if treatment is delay or denied" or "[s]ervices are needed to alleviate pain and suffering." Alaska Dep't of Corrs., *Policies and Procedures* 807.02, VII.B.1 (June 18, 2008).

**[13]** I have not been able to locate exact rules for Hawaii, Idaho and Montana. Idaho has a general rule that "[a]ny extraordinary treatment shall be approved by the health authority prior to treatment." Idaho Admin. Code 06.01.01.302.05.c (2014). Montana has different approach: "All residents [at community correctional centers] shall pay for their own . . . medical and dental expenses." Mont. Admin. R. 20.7.204(1) (1982). Similarly, inmates incarcerated Hawaii are responsible for a medical co-payment for many types of treatment, and must pay the full cost of elective procedures. Hawaii Dep't of Public Safety, Policy No. COR.10.1A.13 (2010).

Colwell's case evidences the fact that NDOC makes individualized, case-by-case assessments, as required by Medical Directive 106, because Colwell received cataract removal surgery on his left eye in 2000 despite the fact that he had vision in both eyes.  Nevada's policy,[14] which is consistent with that of other jurisdictions, both federal and state, is not a blanket "one good eye" policy.

B

If NDOC does not have a *policy* of not treating cataracts, then we need to consider the facts of Colwell's case.  In *Estelle*, the Supreme Court held that "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference."  429 U.S. at 106.  We have held that deliberate indifference requires a showing that failure to treat an inmate's condition "could result in further significant injury or the unnecessary and wanton infliction of pain."  *Jett*, 439 F.3d at 1096 (internal quotation marks omitted).

Judged by that standard, prison officials have not been deliberately indifferent to Colwell's condition.  Colwell has been blind in his right eye since 2002, and his condition has not worsened since then.  During the time that he had the cataract, Colwell declined medical treatment—that is, he decided to live with the condition—for five years.  It is undisputed that Colwell's cataract is not painful and that the cataract has not—and will not—cause irreversible damage. His monocular vision can be corrected by surgery in the

---

[14] Nevada urges us to adopt a test for "overall visual acuity" to determine who has a "serious medical need" and is entitled to cataract surgery.  That standard, although not articulated in Medical Directive 106, is closest to the BOP's and the State of Washington's guidelines.

future, and NDOC has said that it will revisit the question of surgery should anything change in Colwell's condition.[15] Alternatively, the majority cites "the other harms and dangers that flow from" monocular blindness as evidence of deliberate indifference. Maj. Op. at 14. But as I discussed above, these harms and dangers cannot support a finding of deliberate indifference.

To the extent that there are future dangers that may be caused by monocular blindness, there is no evidence that such unidentified dangers pose an "unreasonable risk of serious damage to his future health." *Helling*, 509 U.S. at 35. Given Colwell's history, it is probable that these future "dangers" include unfortunate, but minimally harmful, cuts and scrapes. Such potential injuries are not enough to show that NDOC's denial of surgery poses an unreasonable risk of serious damage to Colwell's future health. Accordingly, I would hold that Colwell cannot prove "harm caused by the indifference," as required by *Jett*. *See* 439 F.3d at 1096.

NDOC, like all prisons, must make difficult decisions about inmate medical care and control costs wherever possible, consistent with the Eighth Amendment. *See Peralta*, 744 F.3d at 1084 ("A prison medical official who fails to provide needed treatment because he lacks the necessary resources can hardly be said to have intended to punish the inmate."). I assume that NDOC would prefer to treat Colwell's cataract. But, given his individual circumstances, NDOC made a reasonable medical decision

---

[15] The majority states that monocular blindness "is harm in and of itself." Maj. Op. at 14. This reasoning begs the question. Were the majority's reasoning correct, any injury or condition would qualify because the injury would be harm in and of itself.

that Colwell would receive regular evaluations to monitor his condition, and if it worsens, would consider a new medical request. Although NDOC's administrators and physicians may have a different perspective from that of Colwell's treating physicians, monitoring a cataract, rather than performing surgery, is a legitimate medical decision. *See* Am. Optometric Ass'n, *Care of the Adult Patient with Cataract* 17 (2010), *available at* www.aoa.org/documents/optometrists/CPG-8.pdf ("If the patient has few functional limitations as a result of the cataract and surgery is not indicated, it may be appropriate to follow the patient at 4 to 12-month intervals to evaluate eye health and vision."). And such differences of opinion do not evidence deliberate indifference. *Jackson*, 90 F.3d at 332 ("[W]here a defendant has based his actions on a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances, plaintiff has failed to show deliberate indifference, as a matter of law."); *see also Cobbs*, 475 F. App'x at 582–83 (finding that a directive to monitor an inmate's cataract closely was "the product of considered medical judgment"); *Samonte*, 264 F. App'x at 636 (holding that refusal to authorize cataract surgery after a doctor recommended surgery was a difference of medical opinion). Indeed, this is not a case where "an individual sat idly by as another human being was seriously injured," *McGuckin*, 974 F.2d at 1060, because NDOC provided Colwell with regular eye care. As the majority states, Colwell received cataract surgery on his left eye, yearly physicals, and consultations with an opthamologist and an optometrist. *See* Maj. Op. at 5–7. Such routine eye care "belies the notion that [NDOC] acted with deliberate indifference." *Cobbs*, 475 F. App'x at 583; *see also Estelle*, 429 U.S. at 107 (finding inmate's claim noncognizable where he received medical treatment on seventeen occasions.);

*Hummer*, 407 F. App'x at 113 (upholding summary judgment where inmate "failed to present evidence showing that the defendants' denial of cataract surgery in his right eye has caused or will cause further injury").[16]

NDOC's treatment was reasonable. Colwell is not in any pain and he is able to engage in many activities. The alternative course of treatment that NDOC selected—wait and see—did not cause life-threatening injury. Because of Colwell's functionality, NDOC's decision not to authorize cataract removal surgery was consistent with Medical Directive 106. Instead, this case is most like *Samonte* and *Layton*, where this court and the District of Nevada found that NDOC's refusal to authorize cataract removal surgery did not violate the Eighth Amendment. *See Samonte*, 264 F. App'x at 636 ("Dr. Bauman's refusal to authorize cataract surgery after another doctor determined that such surgery was an option was a difference of medical opinion, insufficient by

---

[16] The panel cites *Snow*, 681 F.3d 978, as an example where prison officials rejected the recommendations of outside specialists and unreasonably denied the inmate surgery for two years. Maj. Op. at 15. The majority's reliance on *Snow* is misplaced. In *Snow*, the inmate was in "excruciating and unbearable pain." 681 F.3d at 983. Snow's hips had degenerated to the point where he was barely able to walk, could not kneel, and required assistance with everyday activities such as getting out of bed and putting on his socks. *Id.* at 982–83. The state even conceded that Snow had a serious medical need. *Id.* at 985. But after Snow's treating physicians indicated that he needed bilateral hip replacement surgery, NDOC authorized only pain relievers and anti-inflammatories. *Id.* at 983. In turn, the medications made Snow's creatinine levels skyrocket, causing a potentially life-threatening situation. *Id.* at 984. We observed that the inmate's medical condition interfered with his ability to function. *Id.* And we questioned whether it was a reasonable medical decision to adopt a medication only approach, where doing so long-term caused additional serious medical problems. *Id.* at 988.

itself to raise a triable issue of deliberate indifference.") (internal quotation marks omitted); *Layton*, 2012 WL 6969758 at *10 (finding no deliberate indifference where "[d]efendant's decision to deny Layton's request for cataract surgery on the grounds that Layton's condition did not meet the prison's medical criteria amounts to a difference of opinion regarding the appropriate course of treatment.").

Finally, NDOC could not have been deliberately indifferent to Colwell's serious medical needs if it did not know why Colwell required cataract removal surgery or whether surgery was necessary for Colwell to complete the required activities of daily living. *Farmer*, 511 U.S. at 837–38 (clarifying that deliberate indifference is comparable to a reckless *mens rea* in that recklessness is the disregard of a known risk of harm). His annual physicals—at least those to which Colwell consented—ask the physician to report whether he had any "functional limitation/disability." There are no comments in these sections. In a 2009 Consultation Report, Dr. Scott checked "yes" to the question "[d]oes this condition significantly affect qualify of life?", but he did not explain how the condition affected Colwell, and he wrote on the front of the report that he had discontinued the report altogether. In sum, neither Colwell's requests nor the discontinued consultation report provided information that put prison officials on notice that Colwell's cataract rendered him unable to perform the required tasks of daily living.

I would hold that the respondents were not deliberately indifferent to Colwell's alleged "serious medical needs," because Colwell did not meet the difficult legal burden of showing "a purposeful act or failure to respond to a prisoner's pain or possible medical need and [ ] harm caused by the indifference." *Jett*, 439 F.3d at 1096.

V

The realities of an overcrowded prison system force difficult choices about the appropriate treatment for inmates' medical needs. The growing number of elderly inmates makes this problem all the more difficult because physical and mental functions often decline with age.[17] Between 2007 and 2010, the number of prisoners over the age of 65 grew 94 times faster than the general prison population; it is estimated that one third of prisoners will be over the age of 50 by 2030.[18] Nationally, it costs $16 billion to incarcerate 246,600 elderly inmates. American Civil Liberties Union, The Mass Incarceration of the Elderly 28 (June 2012), available at https://www.aclu.org/files/assets/elderlyprisonreport_2012 0613_1.pdf. According to the State, in Nevada, elderly inmates constitute 5.8% of the state's prison population, but they account for 20% of the prison's annual budget.[19]

Cataracts are a particularly common—and costly—problem. In the general population, 20.5 million Americans over the age of 40 have cataracts. *See*, Centers for Disease

---

[17] See Nadine Curran, *Blue Hairs in the Bighouse: The Rise in the Elderly Inmate Population, Its Effect on the Overcrowding Dilmma and Solutions to Correct It*, 26 New. Eng. J. on Crim. & Civ. Confinement 225, 239–40 (2000) (describing changes caused by aging); Timothy Curtin, *The Continuing Problem of America's Aging Prison Population and the Search for a Cost-Effective and Socially Acceptable Means of Addressing it*, 15 Elder L.J. 473, 481 (2007).

[18] Casey N. Ferri, *A Stuck Safety Valve: The Inadequacy of Compassionate Release for Elderly Inmates*, 43 Stetson L. Rev. 197, 197–98 (2013).

[19] Nevada has the sixth largest elderly inmate population in the nation. *See* ACLU, *The Mass Incarceration of the Elderly* at Figure 2A.

Control and Prevention, *Common Eye Disorders*. The CDC predicts that 30.1 million Americans will have at least one cataract by 2020. *Id.* On average, 3 million Americans have cataract surgery each year at an estimated cost of $3,279 per surgery, and in 2013 alone the federal government spent $3.4 billion to treat cataracts through Medicare. *See* Statistic Brain Research Institute, *Cataract Statistics* (verified July 28, 2013), www.statisticbrain.com/cataract-statistics.

If we are going to assume responsibility for prescribing the level of health care for the nation's inmates, we need to consider the potential consequences of our choices. At some point, the states may decide not to treat aging prisoners but simply release them.[20] The former inmates will still have whatever serious medical conditions we identified, but some may not have the benefit of the state's care. Whether aging prisoners will have the resources then to attend to their own medical needs remains to be seen. *See, e.g.*, Christine M. Hummert, *Middle of the Road*, 32 J. Legal Med. 295, 295–96 (2011) (discussing mentally disabled inmates and expressing concern that "many of those released from prison are literally standing 'in the middle of the road' with nowhere to turn and no one to turn to."); Ronald H. Aday, Jennifer J. Krabill, *Aging Offenders in the Criminal Justice System*, 7 Marq. Elder's Advisor, 237, 258 ("[I]nmates who have spent a greater portion of their lives incarcerated will need intensive discharge planning and community placement orientation."); Nancy B. Mahon, *Symposium: Death and Dying Behind*

---

[20] Many jurisdictions already allow for compassionate release of terminally ill inmates and those who suffer from chronic conditions. *See* Brie A. Williams, M.D., et al., *Balancing Punishment and Compassion for Seriously Ill Prisoners*, 155(2) Annals of Internal Medicine 122–26 (2011).

*Bars—Cross-Cutting Themes and Policy Imperatives*, 27 J. L. Med. & Ethics 213, 214 (1999) ("[M]ost prison systems do not have the funds or the institutional impetus to provide adequate discharge planning for ill prisoners.").

I repeat myself: If I were the warden and had the resources, I would treat Colwell's cataract, just as I would treat my own cataract, if I had the resources. And there is the rub—the question of resources. I suspect that for a significant number of Americans afflicted with cataracts, surgery is beyond their means. Yet they function quite normally among us, holding jobs and driving cars and carrying on the ordinary activities of life. For most of them, cataract surgery remains elective surgery. *See* Cleveland Clinic, Cole Eye Institute, *Cataracts and Cataract Surgery*, http://my.clevelandclinic.org/cole-eye/diseases-conditions/hic-cataracts-cataract-surgery.aspx (last visited Aug. 1, 2014) ("[T]he patient can decide if and when he or she wants to have surgery (elective surgery)."); American College of Eye Surgeons, *Guidelines for Cataract Practice* 7.2, http://www.aces-abes.org/guidelines_for_cataract_practice.htm (last visited Aug. 1, 2014) ("In most circumstances, cataract surgery is elective."). I do not understand the Eighth Amendment to compel Nevada to provide surgery for John Colwell that he might or might not seek for himself if he were free to do so.

VI

"Caution is necessary lest this [c]ourt become, 'under the aegis of the Cruel and Unusual Punishment Clause, the ultimate arbiter of the standards of criminal responsibility . . . throughout the [Circuit].'" *Gregg*, 428 U.S. at 176 (quoting *Powell v. Texas*, 392 U.S. 514, 533 (1968) (omission in

original); s*ee also Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982) ("The Eighth Amendment is not a basis for broad prison reform."). Although I sympathize with Colwell's plight, he was not denied medical treatment in violation of the Eighth Amendment's prohibition against cruel and unusual punishment because the respondents were not deliberately indifferent to Colwell's condition. Accordingly, I would affirm the judgment of the district court in favor of the respondents.

I respectfully dissent.